
E-FILED
Monday, 14 January, 2008  04:08:31 PM
Clerk, U.S. District Court, ILCD

(Ex-A-3)
1



11:42:43

(A-2)

GOV    24    2





Transcript opening arg.    617-619

1    and he lived north of Kankakee about a half an hour near

2    Chicago in a town called Matteson.  His girlfriend was a

3    19-year-old woman named Reagan Booker.  The two of them had

4    been dating for several years during the time Ms. Booker was

5    in high school.

6            Ms. Booker had a sister named Loren.  Loren is

7    older than Reagan.  By 2003, Loren and Reagan were attending

8    Parkland College here in Urbana, and one of their friends was

9    Tiffany Sanders.  They were attending school, and often they

10   would drive on the weekends back to their homes near Chicago.

11   Mr. Prendergast, being Ms. Reagan Booker's boyfriend, would

12   often accompany her and take her, drive her back to Urbana.

13   He'd often stay with her in Urbana.  And in 2003, the early

14   part of 2003, he purchased a 2003 Cadillac Escalade, a very

15   expensive vehicle.

16           Meanwhile, at that same time, about, as I said, a

17   half hour away in Kankakee, that's where the defendant lived.

18   He lived at a residence at 333 Wildwood.  And he dated a woman

19   by the name of Lakesia Winfield.  He was unemployed.  He dated

20   Ms. Winfield, had no car.  And his best friend, the person he

21   spent most of his time with, was a man by the name of Derrick

22   Crawford.

23           Mr. Crawford also had no car, but he would often

24   borrow his girlfriend -- Mr. Crawford would often borrow his

25   girlfriend, Dawn Boyd's car.  That car was a late 1990s model

618

1    or early 2000 model Dodge Intrepid, tan or gold in color.

2    The defendant and Mr. Crawford would often be in that vehicle

3    and Mr. Crawford driving.

4              And on March 16, 2003, that's exactly what was

5    happening.

6              As I mentioned, Mr. Prendergast and Reagan Booker

7    and Loren Booker and Tiffany Sanders left their homes in

8    Matteson on March 16th to return to Parkland.  They stopped at

9    the Amoco gas station which is just off of Interstate 57 going

10   south towards Champaign.  Mr. Prendergast was driving his

11   Cadillac Escalade, and Ms. Reagan Booker was with him in the

12   passenger seat.  Loren Booker and Tiffany Sanders were in

13   another car, and the four of them in these two vehicles

14   stopped at Amoco on each side of the same gas pump.  Mr.

15   Prendergast got out, pumped his gas, went into the store, came

16   back outside, and then returned to the store.

17             About that same time, a Dodge Intrepid pulls into

18   the gas station.  The Dodge Intrepid circles the Cadillac

19   Escalade driven by Mr. Prendergast.  It circles that gas pump,

20   then proceeds to pull out of the gas station and then turns

21   around and comes right back in and pulls to the gas pump on

22   the opposite side of the Cadillac.

23             The driver didn't get out.  He didn't pump any gas.

24   But a passenger got out.  He got out and put on a

25   black-colored coat with a hoodie on it and pulled up the

1    hoodie.  That person got -- after putting on that black-hooded

2    coat with the hoodie walked towards the front of the store but

3    never entered, remained there for a period of time.  The

4    driver of the Cadillac -- or the Dodge Intrepid never got out

5    of the car.  And shortly thereafter, that Intrepid pulled away

6    from the gas pump, picked up the person who had gotten out and

7    put the dark-colored coat on, and then encircled that same gas

8    pump where Mr. Prendergast's Cadillac was.  That Dodge

9    Intrepid was owned by the girlfriend of Derrick Crawford.

10            Shortly thereafter, Mr. Prendergast left the store

11    after paying for an item he had purchased, and he returned to

12    the area where Reagan Booker was and her sister and Tiffany

13    Sanders who had remained near the vehicles.  Reagan Booker and

14    Mr. Prendergast met briefly at the front of that Cadillac, and

15    then the two of them went to their respective sides to get

16    back in the vehicle and leave.

17            And they did begin to get back in the vehicle on

18    opposite sides at about the same time.  And about that --

19    about that time, this defendant emerged, his face concealed,

20    wearing this dark-colored coat with the hoodie above his head,

21    carrying a 9 millimeter semiautomatic pistol with at least

22    eight rounds in the clip, confronted Mr. Prendergast and

23    demanded his keys, then shot him.

24            He shot Mr. Prendergast through his left arm.  The

25    bullet entered his left arm, exited underneath of his left

Gov 22 Q



(EX- A 6)



GOV 22 R

(handwritten top) 2 0 5 1 4 5 5

(handwritten right margin)
Quality Cars & Trucks
635 West Broadway
Bradley, I ll, 60915
815-929-9744

## RETAIL INSTALLMENT CONTRACT

| NAME | BUYER | | NAME | CREDITOR-SELLER |
| --- | --- | --- | --- | --- |
| DAWN M | WARD | | QUALITY CARS & TRUCKS | |
| ADDRESS 7361 SOUTH NELSON | | | ADDRESS 635 West Broadway | |
| CITY KANKAKEE | STATE IL | ZIP 60901 | CITY Bradley, IL 60915 | ZIP |
| | | | 815-929-9744 | NO. |

All references to "You" and "Your" means each Buyer above, jointly and severally. The terms "Us", and "We" refer to Creditor-Seller and Creditor-Seller's assignee. You may buy the vehicle described below for cash or credit. The cash price is shown below as the "Cash Price". The credit price is shown below as "Total Sale Price". You have elected to purchase from Us on a Total Sale Price basis, upon the conditions set forth below and on the reverse side of this Retail Installment Contract ("Contract"), the below described property ("Vehicle"), delivery and acceptance of which in good condition and repair is hereby acknowledged by You. Your promise to pay to Us all amounts due under this Contract.

| New or Used | Year and Make | Model and Body Style | Color | Vehicle Identification Number | Odometer Reading |
| --- | --- | --- | --- | --- | --- |
| USED | 2000 DODGE | INTREPID 4DR | BRWN | 2B3HD46R8YH291 | 76493 |

### TRUTH IN LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of Your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost You. | Amount Financed The amount of credit provided to You or on Your behalf. | Total of Payments The amount You will have paid after You have made all payments as scheduled. | Total Sale Price The total cost of Your purchase on credit, including Your downpayment of $1500.00 |
| --- | --- | --- | --- | --- |
| 24.0 % | $5008.47 | $10547.34 | $15558.81 | $17055.81 |

Payment Schedule: Your payment will be:

| No. of Payments | Amount of Payments | When Payments Are Due |
| --- | --- | --- |
| 41 | 379.41 | 7-8-03 and same date of each following month. |

Insurance
CREDIT LIFE INSURANCE AND CREDIT DISABILITY INSURANCE ARE NOT REQUIRED TO OBTAIN CREDIT, AND WILL NOT BE PROVIDED UNLESS YOU SIGN AND AGREE TO PAY THE ADDITIONAL COST. The term of the insurance shall be the same as the term of Your contract.

| Type | Premium | Signature |
| --- | --- | --- |
| Credit Life | $ N/A | Signature of Buyer Requesting Only Life Insurance ____ Age ___ |
| Credit Disability | $ N/A | Signature of Buyer Requesting Only Disability Insurance ____ Age ___ |
| | | Signature of Buyer Requesting Life and Disability Insurance ____ Age ___ |

Security: You are giving a security interest in the goods or Vehicle being purchased.
Late Charge: If a payment is more than 10 days late, You will be charged 5% of the payment or $10, whichever is greater.
Prepayment: If you pay off early, You may be entitled to a refund of part of the Finance Charge.
See below and the other side of this contract for any additional information about nonpayment, default, any required repayment in full before the scheduled date, and prepayment refunds and penalties.

(handwritten left margin)
Dawn Ward
car Contract to her
car. She bought this
Intrepid June/9/2003.
Its No way it was
used in the murder
on 3/14/03.

### ITEMIZATION OF AMOUNT FINANCED

1. Cash Price (including accessories and improvements to the Vehicle) ........ $ 9995.00 (1)
2. Sales Tax ........ $ 657.78 (2)
3. Down Payment Calculation:    Cash Down Payment ........ $ 1500.00 (A)
   Trade-In Description:    Gross Trade-In ........ $ N/A (B)
   Make _____ Payoff Made by Seller ........ $ N/A (C)
   Model _____ to _____ ........ $ N/A (D)
   (list trade-in if negative number, insert "0" in line 3(D) and transfer difference to 3(H) below) (B-C) ........ $ N/A (D)
   Total Down Payment ........ (A + D) $ 1500.00 (4)
4. Unpaid Balance of Cash Price (1 plus 2 less 3) ........ $ 9152.78 (4)
5. Other Charges Including Amounts Paid to Others on Your Behalf:
   *NOTICE: A portion of these charges may be paid to or retained by Seller.
   A. Cost of Required Physical Damage Insurance Paid to Insurance Company* ........ $ N/A (A)
   B. Cost of Optional Extended Warranty or Service Contract* ........ $ 1230.00 (B)
   C. Cost of Optional Credit Life Insurance Paid to Insurance Company* ........ $ N/A (C)
   D. Cost of Optional Credit Disability, Accident and Health Insurance Paid to Insurance Company* ........ $ N/A (D)
   E. *Cost of Fees Paid to Public Officials for Perfecting, Releasing or Satisfying a Security Interest* ........ $ N/A (E)
   F. Documentary Fee* (See Documentary Fee Notice Below) ........ $ 54.97 (F)
   G. Cost of Fees Paid to Public Officials for Certificate of Title, License and Registration ........ $ 90.00 (G)
   H. Other Charges (Seller must identify who will receive payment and describe purposes)* ........ $ N/A (H)
   H. to _____ ........ $ N/A
   I. to _____ for lien or lease payoff ........ $ N/A
   Total of Other Charges and Amounts Paid to Others on Your Behalf ........ $ N/A (5)
6. Less Prepaid Finance Charge ........ $ N/A (6)
7. Amount Financed - Unpaid Balance (4 + 5 less 6) ........ $ 10547.34 (7)

PROPERTY INSURANCE: You must insure the Vehicle securing this Contract. YOU MAY PURCHASE OR PROVIDE THE INSURANCE THROUGH ANYONE YOU CHOOSE WHO IS REASONABLY ACCEPTABLE TO US. The collision coverage deductible may not exceed $500. If You get insurance from or through Us, You will pay $ _____ for _____ of coverage. The premium is calculated as follows:

☐ $ _____ N/A Deductible, Collision Coverage
☐ $ _____ Deductible, Comprehensive Coverage
☐ $ _____ Fire-Theft and Combined Additional Coverage

THE INSURANCE CONTRACTED FOR IN CONNECTION WITH THIS SECURITY AGREEMENT DOES NOT PROVIDE FOR LIABILITY INSURANCE FOR BODILY INJURY AND PROPERTY DAMAGES CAUSED TO OTHERS OR COMPLY WITH ANY STATE LIABILITY LAWS.

OPTIONAL EXTENDED WARRANTY OR SERVICE CONTRACT: Although You are not required to purchase an optional extended warranty or service contract as a condition of purchasing the Vehicle on credit, by initialing below You are indicating that You voluntarily elect to buy an optional extended warranty or service contract covering the repair of certain major mechanical breakdowns of the Vehicle and related expenses. Refer to the optional warranty or service contract for details about coverage and duration.
Optional Extended Warranty or Service Contract Price $ 1230.00 Initials _____ Term 2/24 Company WANT

DOCUMENTARY FEE: A DOCUMENTARY FEE IS NOT AN OFFICIAL FEE. IT IS NOT REQUIRED BY LAW, BUT MAY BE CHARGED TO BUYER FOR HANDLING DOCUMENTS AND PERFORMING SERVICES RELATED TO CLOSING OF A SALE. THE BASE DOCUMENTARY FEE BEGINNING JANUARY 1, 1992, WAS $40. THE MAXIMUM AMOUNT THAT MAY BE CHARGED FOR A DOCUMENTARY FEE IS THE BASE DOCUMENTARY FEE OF $40 WHICH SHALL BE SUBJECT TO AN ANNUAL RATE ADJUSTMENT EQUAL TO THE PERCENTAGE OF THE INCREASE IN THE BUREAU OF LABOR STATISTICS CONSUMER PRICE INDEX. THIS NOTICE IS REQUIRED BY LAW.

ARBITRATION NOTICE: PLEASE SEE THE REVERSE SIDE OF THIS CONTRACT FOR INFORMATION REGARDING THE ARBITRATION CLAUSE CONTAINED IN THIS CONTRACT.

ADDITIONAL TERMS AND CONDITIONS: THE ADDITIONAL TERMS AND CONDITIONS, INCLUDING THE ARBITRATION CLAUSE SET FORTH ON THE REVERSE SIDE HEREOF ARE A PART OF THIS CONTRACT AND ARE INCORPORATED HEREIN BY REFERENCE.

### NOTICE TO BUYER

1. Do not sign this agreement before You read it or if it contains any blank spaces. 2. You are entitled to an exact copy of the agreement You sign. 3. Under the law You have the right, among others, to pay in advance the full amount due and to obtain under certain conditions a partial refund of the finance charge.

You agree to the terms of this Contract and acknowledge that You received a copy of this Contract with all blanks filled in and that You have read it and understand it.

RETAIL INSTALLMENT CONTRACT

Buyer's Signature: x Dawn Ward

Buyer's Signature: x

Guarantor's Signature: x

I hereby guarantee the collection of the above described amount upon failure of the Seller named herein to collect said amount from the Buyer named herein.

Seller: QUALITY CARS/TRUCKS By: Kirk Van Vogle Title: PRESIDENT

This Contract is signed by the Seller, Buyer(s) and Guarantor hereto this 19TH day of June 2003.

NOTICE OF ASSIGNMENT: The Seller has assigned this Contract to Credit Acceptance Corporation in accordance with the terms and conditions set forth on the reverse side of this Contract. This assignment is without recourse. You must make all future payments to: CREDIT ACCEPTANCE CORPORATION, 25505 WEST TWELVE MILE ROAD - SUITE 3000, SOUTHFIELD, MICHIGAN 48034-8339, 1-(800)-634-1506.

Seller: QUALITY CARS/TRUCKS By: Kirk Van Vogle Title: PRESIDENT

ILLINOIS CREDIT ACCEPTANCE CORPORATION (5-03)

ORIGINAL

## OTHER IMPORTANT AGREEMENTS

**Security Interest.** You give Us a security interest in: 1). The Vehicle and all parts or goods installed in it; 2). All money or goods received (proceeds) for the Vehicle; 3). All insurance, maintenance, service or other contracts We finance for You; and 4). All proceeds from insurance, maintenance, service or other contracts We finance for You [this includes any refunds of premiums] [...] This secures payment of the Contract and all Your other agreements in the Contract. It also secures Your other agreements in this Contract. [...] The certificate of title shows our security interest (lien) in the Vehicle.

**Late Charge.** You promise to pay a late charge when due, if You fail to make a payment when it is due. You agree to pay Us a late charge as stated on the front of this Contract. You agree that We do not waive our right to collect a late charge by accepting one or more late payments from You.

**Bad Check Charge.** You agree to pay Us a bad check charge of [...] for each other payment permitted by applicable law) for any check or the instrument given by You to Us that is returned by Your bank because an insufficient funds or because Your bank account was closed.

**Ownership and Risk of Loss.** You promise to pay Us all You owe under this Contract even if the Vehicle is damaged, destroyed or missing.

**Your Other Promises to Us.** You promise that:
- You will not remove the Vehicle from the United States or Canada.
- You will not sell, rent, lease or otherwise transfer any interest in the Vehicle or this Contract without our written permission.
- You will not expose the Vehicle to misuse or confiscation.
- You will not permit any other lien or security interest to be placed on the Vehicle.
- You will preserve and protect the Vehicle and keep it in good condition and repair.
- You will not use the Vehicle for a trade or business without our written consent.
- You will not use the Vehicle unlawfully or abandon it. If a governmental agency impounds the Vehicle, You will notify Us immediately and regain possession of the Vehicle. We may regain possession of the Vehicle and treat it as a default.
- You will pay all taxes, assessments, rentals, charges, and other fees imposed on the Vehicle when they are due. If We pay any repair bills, storage bills, taxes, fines, fees, or other charges on the Vehicle, You agree to repay the amount to Us.
- You will permit Us to inspect the Vehicle at any reasonable time.
- You will promptly sign, or cause others to sign, and give Us any documents We reasonably request to perfect our security interest.
- You have not made and will not make an untrue, misleading or incomplete statement in a credit application, this Contract or any information provided in connection with this Contract.
- You will promptly provide Us with any additional personal or financial information concerning You or any information about the Vehicle that We may reasonably request from time to time.
- You will immediately notify Us if You change Your name or address.

**Prepayment.** You have the right to prepay Your account balance early without penalty. If You prepay in full, You may be entitled to a refund credit of part of the pre-computed finance charge. The credit will be calculated in accordance with the actuarial method. We will apply the credit to the amount You owe Us. If You paid Us more than the amount owed to Us under this Contract, We will retain a $25 acquisition fee before calculating any refund credit. A minimum finance charge of $25 may be charged. We will not credit or refund amounts less than $1.00.

If You prepay only a portion of the balance remaining under this Contract, We will apply the prepayment to Your account balance, however a prepayment will not change any other scheduled payments. You must still make all scheduled payments on time until Your obligation under this Contract is paid in full. If You make a partial prepayment Your last payment or payments may be less than the scheduled amount due.

**Required Physical Damage.** You agree to have physical damage insurance covering loss or damage to the Vehicle for the term of this Contract. Unless You provide Us with evidence of the insurance coverage required by Your agreement with Us or at any time during the term of this Contract You do not have physical damage insurance which covers both the interest of the Vehicle and our interest in the Vehicle. We may purchase insurance at Your expense to protect our interests in the Vehicle. This insurance may, but need not, protect Your interests. The coverage that We purchase may not pay any claims that You make or any claims that is made against You in connection with the Vehicle. You may later cancel any insurance purchased by Us, but only after providing Us with evidence that You have obtained insurance as required by our agreement. If We purchase insurance for the Vehicle, You will be responsible for the costs of that insurance, including finance charges and any other charges We may impose in connection with the placement of the insurance, until the effective date of the cancellation or expiration of the insurance. The costs of the insurance may be added to Your total outstanding balance or obligation. The costs of insurance may be more than the cost of insurance You may be able to obtain on Your own.

We are under no obligation to buy any insurance, but may do so if We desire. The finance charge We will impose will equal the Annual Percentage Rate for this Contract. You agree to pay all costs, charges, including finance charge in full under this Contract with the payments shown on the Payment Schedule.

If the Vehicle is lost or damaged, You agree that We can use any insurance settlement either to repair the Vehicle or apply to Your account balance. If the Vehicle is lost or damaged, You agree to [...] proceeds that do not pay Your obligation in full under this Contract will be applied as a partial payment.

**Optional Insurance, Maintenance or Service Contracts.** This Contract may contain charges for optional insurance, maintenance, service or warranty contracts. If the Vehicle is repossessed, You agree that We may claim benefits under these contracts and terminate them to obtain refunds of unearned charges.

**Insurance, Maintenance, Service or Other Contract Charges Released to Us.** If any charge for required insurance is returned to Us, it may be credited to Your account in accordance with the Prepayment section of this Contract or used to buy similar insurance which covers only our interest in the Vehicle. Any refund on optional insurance, maintenance, service, warranty or other contracts obtained by Us will be credited to Your account in accordance with the Prepayment section of this Contract.

**Default and Acceleration of the Contract.** You will be in default if:
- You fail to pay any amount due under this Contract when it is due.
- If You break any of Your other promises You made in this Contract.
- A proceeding in bankruptcy, receivership or insolvency is filed by or against You or Your property.

If You are in default of this Contract, We may declare the entire unpaid balance of this Contract due and payable immediately at any time without notice to You, unless We are required by law to provide You with such notice, and subject to any right You may have to reinstate the Contract. In figuring what You owe, We will credit the unearned Finance Charge based the sum as if You had prepaid Your obligation under this Contract in full.

**Repossession of the Vehicle.** If You default, We may take possession (repossess) the Vehicle from You. To repossess the Vehicle, We can enter Your property, or the property where the Vehicle is stored, as long as it is done peacefully and the law allows it. Any accessories, equipment or replacements will remain with the Vehicle. You hereby acknowledge and agree that any personal property contained within the Vehicle may be removed and held without liability to Us or our agent. It is Your responsibility to promptly and immediately contact Us to make arrangements for the return of Your personal property. You are responsible for paying all reasonable charges associated with the repossession.

**Getting the Vehicle Back After Repossession.** If We repossess the Vehicle, You have the right to pay to get it back (redeem) and may have the right to reinstate this Contract. If You have the right to reinstate the Contract, We will tell You the amount to pay, the time period to reinstate the Contract and when that time period ends. Your right to redeem the Vehicle ends when We sell, lease, license or otherwise dispose of any or all of the Vehicle in the present condition or following any commercially reasonable preparation or processing.

**Sale of the Repossessed Vehicle.** Any notice that is required to be given to You of an intended sale or transfer of the Vehicle will be mailed to Your last known address, as reflected in our records. In a reasonable period before the date of the intended sale or transfer (or such other period of time as is required by law). If the Vehicle is sold, We will use the net proceeds of the sale to pay all or part of Your debt.

The net proceeds of sale will be figured this way: Any late charges and charges for taking, storing and selling the Vehicle, cleaning and advertising etc., and any attorney fees and court costs, if permitted by law, will be subtracted from the selling price.

If You owe us less than the net proceeds of sale, We will pay You the difference, unless We are required to pay it to someone else. For example, We may be required to pay a lender who has given You a loan and has also taken a security interest in the Vehicle.

If You owe more than the net proceeds of sale, You will pay Us the difference between the net proceeds of sale and what You owe when We ask for it. If You do not pay the amount when asked, You may also be charged interest at the highest lawful rate until You do pay all You owe Us.

**Collection Costs.** If We hire an attorney to collect what You owe, You will pay the attorney's reasonable fee and any court costs as permitted by law.

**Delay in Enforcing Rights and Changes of this Contract.** We can delay or refrain from enforcing any of our rights under this Contract without losing them. For example, We can extend the time for making some payments without extending others. Any change in the terms of this Contract must be in writing and signed by Us. We and changes are binding. Any part of this Contract is not valid, the other parts will remain enforceable.

**Warranties Seller Disclaims.** You understand that the Seller is not offering any warranties and that there are no implied warranties of merchantability, of fitness for a particular purpose, or any other warranties, express or implied by the Seller, covering the Vehicle unless the Seller extends a written warranty or service contract within 30 days from the date of this Contract.

This provision does not affect any warranties covering the Vehicle that may be provided by the Vehicle manufacturer.

**USED CAR BUYERS GUIDE.** THE INFORMATION YOU SEE ON THE WINDOW FORM FOR THIS VEHICLE IS PART OF THIS CONTRACT. INFORMATION ON THE WINDOW FORM OVERRIDES ANY CONTRARY PROVISIONS IN THE CONTRACT OF SALE.

**Interest After Maturity.** You further agree to pay interest at the Annual Percentage Rate stated on the front of this Contract or at the highest rate permitted by applicable law, on any amounts that remain unpaid after maturity of this Contract.

**Judgment Rate.** Interest on any judgment awarded on this Contract will be at 9% or at the highest rate permitted by applicable law.

**Governing Law.** The terms of this Contract are governed by Illinois law, except to the extent preempted by applicable federal law.

### NOTICE

ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

NOTICE OF POSSIBLE REFUND OF CREDIT LIFE OR DISABILITY INSURANCE PREMIUM: (1) IF YOU HAVE PURCHASED EITHER CREDIT LIFE OR CREDIT DISABILITY INSURANCE, OR BOTH, TO GUARANTEE PAYMENTS BEING MADE IN CASE OF YOUR DEATH OR DISABILITY, ON YOUR VEHICLE PURCHASED UNDER AN INSTALLMENT SALES CONTRACT, YOU MAY BE ENTITLED TO A PARTIAL REFUND OF YOUR PREMIUM IF YOU PAY OFF YOUR INSTALLMENT LOAN EARLY. (2) IN CASE OF EARLY COMPLETE PAYMENT OF YOUR LOAN, YOU SHOULD CONTACT THE SELLER OF YOUR CREDIT LIFE OR CREDIT DISABILITY INSURANCE TO SEE IF A REFUND IS DUE. IF YOUR VEHICLE DEALER FINANCED YOUR LOAN, THE SELLER OF YOUR CREDIT LIFE OR CREDIT DISABILITY INSURANCE IS YOUR VEHICLE DEALER.

### AGREEMENT TO ARBITRATE

Any dispute, controversy or claim between Buyer, Seller and/or Seller's assignee, Credit Acceptance Corporation, or the employees, agents or assignees of the other, arising out of or in any way related to the Contract, or any default hereunder, the collection of any amounts due under this Contract, or the purchase, sale, delivery, set-up, quality of the Vehicle, or any product or service included in the Contract, whether based on contract, an alleged tort or other legal theory, shall be fully resolved by binding arbitration, pursuant to the arbitration award may be entered in any court having jurisdiction. Any question whether a particular controversy or claim is subject to arbitration or any election to the enforceability of all or part of this arbitration provision shall be decided by the arbitrator. All statutes of limitation which otherwise would apply to an action brought in a court of competent jurisdiction on the controversy or claim will be applicable to the arbitration proceeding. This agreement to arbitrate is made pursuant to a transaction involving or affecting interstate commerce, and shall be governed by the Federal Arbitration Act (9 U.S.C. 1 et seq.). The parties understand and agree that they choose arbitration instead of litigation to resolve disputes. The parties voluntarily and knowingly waive any right they may have to a jury trial and both parties agree that all claims must be resolved on an individual basis through arbitration and representative actions, such as class actions, are prohibited.

Notwithstanding the foregoing, Seller and Seller's assignee Credit Acceptance Corporation retain the right (1) to repossess the Vehicle by the exercise of any power of sale under this Agreement, or under any chattel mortgage or other security agreement or instrument, or under applicable law; (2) to exercise self-help remedies such as setoff or repossession; (3) to enforce the monetary obligation of Buyer under this Contract through judicial relief. Such judicial relief may take the form of a lawsuit. The institution and maintenance of any action for judicial relief or exercise of self-help remedies shall not constitute a waiver of the right to submit any controversy or claim to arbitration, including any counterclaim asserted in any such judicial action, and including those controversies or claims arising from the exercise of any such judicial relief or the exercise of self-help remedies. If a demand for arbitration of any counterclaim is made, the entire controversy or claim shall be submitted to binding arbitration pursuant to this section. Upon the termination of arbitration under this Contract the other party shall submit to arbitration any claim or counterclaim which such party may have against the arbitrating party, whether deemed to be compulsory or permissive in law. The failure to bring such a claim or counterclaim shall constitute a waiver of, and bar to, the bringing of such a claim or counterclaim in any subsequent arbitration or legal action. The parties agree that if any provision of this arbitration agreement is invalid or unenforceable under the Federal Arbitration Act or any other applicable law, the provision which is found to be invalid or unenforceable shall be inapplicable and deemed omitted, but shall not invalidate the remaining provisions of this arbitration clause, and shall not diminish the parties obligation to arbitrate the disputes subject to this Contract.

You may elect to have the arbitration proceed in accordance with the rules and procedures of the National Arbitration Forum, the American Arbitration Association or JAMS. You may obtain the rules and procedures, information on fees and costs (including waiver of the fees) along with various other forms issued by: (i) the National Arbitration Forum by calling toll free (800) 474-2371 or by visiting its website at www.arbforum.com; (ii) the American Arbitration Association by calling toll free (800) 778-7879 or by visiting its website at www.adr.org, or (iii) JAMS by calling (949) 224-1810 or by visiting its website at www.jamsadr.com. Upon request to Seller and Seller's assignee, Credit Acceptance Corporation agrees the first party to the arbitration to bear the arbitrator's fee and any other reasonable expense or cost (excluding attorneys fees) that would not be required to bear if you were less to bring this dispute, controversy or claim in court, as well as any other reasonable expense or cost that is unique to the arbitration process. You may outsource or file a claim for arbitration at any of the above-referenced entities. If you do not designate one of the above-referenced arbitration entities in writing, then Credit Acceptance Corporation at its option may choose at a location near where you signed the Contract. Notice of the time, date and location of the arbitration shall be provided to the parties in accordance with the rules and procedures of one of the above arbitration entities you have selected.

### ASSIGNMENT

FOR VALUE RECEIVED, Seller hereby assigns and transfers all Seller's right, title and interest in and to this Contract, and in and to the Vehicle described herein, to CREDIT ACCEPTANCE CORPORATION ("Assignee"), its successors and assigns, pursuant to and in accordance with the terms and conditions set forth in the Dealer Servicing Agreement between Seller and Assignee in effect on the date hereof. Seller gives Assignee full power, either in Assignee's name or in Seller's name, to take all actions which Seller could have taken under this Contract. In order to induce Assignee to accept assignment of this Contract, Seller represents and warrants to Assignee as set forth in such Dealer Servicing Agreement.

ILLINOIS CREDIT ACCEPTANCE CORPORATION (1-08)

A-1



Gov 22 R

A-4

Nov 22 @



1    Circumstantial evidence is the proof of a series of

2    facts from which you can draw an inference.  And that says

3    that's what circumstantial evidence is, and the judge gave you

4    an example of it at the beginning of the trial.  And the

5    example that I would give to you is this.  If we all go to bed

6    tonight without looking outside and we wake up tomorrow

7    morning and we look outside and we see white on the ground, we

8    know it snowed.  We know it did.  We didn't see it.  We didn't

9    listen to a weather forecast and expect it.  But by looking at

10   that fact, white on the ground, we know it snowed.  Proof of

11   one fact with which you know another one occurred, or at least

12   you can draw an inference.

13   A gold Intrepid driven by his girlfriend -- his

14   best friend's girlfriend.  Passenger gets out.  He rides as a

15   passenger.  The person that gets out matches the description

16   of him.  Circumstantial evidence.

17   The person that comes up and shoots Steven

18   Prendergast less than ten minutes later is wearing that type

19   of clothing.  Circumstantial evidence.

20   His fingerprints are inside the victim's vehicle.

21   Circumstantial and direct evidence.

22   The last person that was known to have access to

23   this gun was the defendant.  Circumstantial evidence.

24   And I could go on and on and on and on.  But the

25   direct evidence and the circumstantial evidence from any angle

1   the defendant, Antonio Sherrod, has been convicted of a crime

2   punishable by more than one year imprisonment," and then

3   follow that with -- I will say, "Now I'm giving you a limiting

4   instruction as to how you will consider this evidence."

5         Is that procedure acceptable, Mr. Bass?

6         MR. BASS:  Yes, Your Honor.

7         THE COURT:  Okay.  So just remind me in case --

8   with the light show on and off that I don't fall asleep here

9   this afternoon -- remind me to give it at the conclusion of

10  Shay Guttendorf's testimony before we call the next witness.

11        Mr. Beckett.

12        MR. BECKETT:  I don't know what the Court's plan or

13  Court's schedule is for the day, but I do have to teach this

14  evening.

15        THE COURT:  4:30.

16        MR. BECKETT:  Okay.  That would be great.

17        THE COURT:  And unless you tell me then that we've

18  got things to argue after 4:30, 4:30 will be it.  We'll come

19  back at 8:45, but that schedule is based on no surprises as to

20  who the witnesses are and what's going to come up.

21        So Shay Guttendorf's going to be followed by whom?

22        MR. BASS:  She will be followed by Lakesia

23  Winfield, and I wanted to alert Your Honor to the fact that

24  Ms. Winfield is going to be called in the government's case

25  for a limited purpose to establish her knowledge of the

1    defendant and the fact that he was a friend of Derrick

2    Crawford and Derrick Crawford drove a gold Intrepid, and she's

3    going to identify that gold Intrepid.

4            She's also a witness, possible witness for the

5    government in rebuttal should an alibi defense be presented,

6    but I don't intend to get into that because it's not relevant

7    until such a defense is presented.

8            So the scope of my direct examination of Ms.

9    Winfield is going to be limited.

10           THE COURT:  Okay.

11           MR. BASS:  I just wanted to alert that to Your

12   Honor.

13           THE COURT:  Does she know that her subpoena then

14   extends to potentially being recalled next week?

15           MR. BASS:  I advised her of that today, Judge.

16           THE COURT:  Okay.  Any problems that you expect

17   with that testimony, Mr. Beckett?

18           MR. BECKETT:  No.

19           THE COURT:  Okay.  So we'll be -- that will take us

20   through the end of the day, or you'll have a third witness?

21           MR. BASS:  Sergeant Cote, Earl Cote, who was the

22   officer primarily responsible in addition to Lieutenant Kane

23   for seizing much of the evidence.  So he'll be a lengthy

24   witness.  I expect to get started with him today but may not

25   finish.

(EX-A-2)
11



GOVERNMENT
EXHIBIT
25S
04-20001
PENGAD-Bayonne, N.J.

11:42:15

1          Q       What was her name?

2          A       Dawn, Dawn Ward.

3          Q       Dawn Ward.

4                  THE COURT:  W-a-r-d?

5                  THE WITNESS:  W-a-r-d.

6    BY MR. BASS:

7          Q       Did she live in Kankakee at this time?

8          A       Yes.

9          Q       Did you ever know Mr. Crawford to drive a car owned

10   by Ms. Ward?

11         A       Yes.

12         Q       What kind of car was that?

13         A       That would have been a brown Intrepid.

14         Q       A?

15         A       Brown/gold/tan Intrepid.

16         Q       How would you characterize the frequency with which

17   Mr. Crawford drove that tan/brown/gold Intrepid?

18         A       Like every day, really.

19         Q       All right.  And are we, again, talking about this

20   same time period after you returned from Mardi Gras?

21         A       Okay.  That I'm not for sure.  I'm not for sure,

22   but he driven it.

23         Q       I'm not following you.  Can you repeat that?

24                 When do you recall Mr. Crawford driving Ms. Ward's

25   Intrepid?

1      A      In March until --

2      Q      Until when?

3      A      Like until he left Kankakee.

4      Q      Do you know when it was Mr. Crawford left Kankakee?

5      A      No.  I'm not for sure.

6      Q      Did there come a time where you no longer saw him?

7      A      Yes.

8      Q      Do you recall a time when you stopped -- when Mr.

9      Sherrod was no longer in Kankakee after March?

10     A      When Mr. Sherrod was no longer in Kankakee?

11     Q      Yes, Mr. Sherrod.

12     A      What you mean by that question?

13     Q      Well, after March of 2003, did you continue to date

14     him in April and May?

15     A      Yes.

16     Q      Through the summer?

17     A      Yes.

18     Q      Did there come a time where he was no longer in

19     Kankakee in 2003?

20     A      No.

21     Q      Well, in relation to this case you're now

22     testifying in, did there come a time where Mr. Sherrod, as a

23     result of this case, was no longer in Kankakee?

24     A      I don't understand what you saying.

25     Q      Is Mr. Sherrod living in Kankakee now?

LAKESIA Winfield (INTrepd)

1    is that right?

2         A    Yes.

3         Q    And the next one, 39D.

4              This is the one dated July 5th of '03; is that

5    right?

6         A    Yes, it is.

7         Q    And finally, 39E, the one August 19th of '03; is

8    that right?

9         A    Yes.

10        Q    So from May, June, July, and August, Mr. Sherrod,

11   to your recollection, did he keep his hair closely cut,

12   unbraided?

13        A    You said May, June, and July?

14        Q    Yes.

15        A    He had short haircut.

16        Q    Now, when Mr. Crawford -- when you would see Mr.

17   Crawford drive Ms. Ward's Intrepid, who would most often be

18   with him in that car?

19        A    Antonio.

20        Q    Do you ever recall being -- at least to your

21   knowledge -- and you said that you saw Mr. Sherrod about every

22   day?

23        A    Yes.

24        Q    Do you ever recall -- again, I'm talking about

25   March of 2003 after you got back from New Orleans -- do you

1   ever recall anyone riding with Mr. Crawford in that gold

2   Intrepid more, any more often than Mr. Sherrod?

3        A     Yes.  Well, you asked me with Antonio Sherrod and

4   Derrick Crawford?

5        Q     Let me ask that again.

6              In March of 2003, was there anyone that traveled

7   more often with Mr. Crawford in that gold Intrepid other than

8   Mr. Sherrod?

9        A     I want to make sure I'm right because it would be

10  somebody else with Derrick but not with Antonio and Sherrod --

11  I mean, Antonio and Derrick.

12       Q     Let me ask it this way.

13             Who did you see most often driving, or riding with

14  Mr. Crawford in that Dodge Intrepid?

15       A     Antonio Sherrod.

16       Q     And when the two of them would be together, who

17  would most often be driving?

18       A     Derrick Crawford.

19       Q     Where would Mr. Sherrod be riding?

20       A     In the front seat.

21       Q     Now, finally, Ms. Winfield, I want to show you a

22  couple additional photographs.  If we could pull up Government

23  Exhibit 25S.

24             And, again, you can look to your -- whatever is

25  easiest, to your left on the big screen or to your right.

1          And do you recognize -- this is 25S -- do you

2    recognize any vehicle that's shown in that photograph?

3          A     I can recognize the Dodge Intrepid.

4          Q     Okay.  Can you draw a circle around or put a

5    mark -- if you'd put your finger and press on the screen

6    there, you can make a little yellow mark.  So could you do

7    that on the vehicle that you're talking about?

8          A     Right here [indicating].

9          Q     Press a little bit harder.

10         A     Okay [indicating].

11         Q     How do you recognize that?

12         A     Because Derrick Crawford girlfriend drives a Dodge

13   Intrepid.

14         Q     Okay.  So what do you think about when you see this

15   photograph?

16         A     It was Derrick Crawford's girlfriend car.

17         Q     When you -- in March of 2003, were you working at

18   R & R Donnelley at that time?

19         A     Yes, I was.

20         Q     Did you have a regular work shift of hours that you

21   worked?

22         A     Yes.

23         Q     What was that?

24         A     2:30 to 10:30.

25         Q     And what days did you work?

(A-14)



03/16/03    Sun A0
11:42:44P    30

Cam 6

GOVERNMENT
EXHIBIT
25X
04-20001
PENGAD-Bayonne, N.J.

11:42:44

A-15





11:42:47

A-16



GOVERNMENT
EXHIBIT
25Z
04-20001

11:42:49

A-17



GOVERNMENT
EXHIBIT
25AA
04-20001

11:42:53

A-18





11:42:54

(A-19)

**DEPARTMENT OF THE TREASURY**
**BUREAU OF ALCOHOL, TOBACCO AND FIREARMS**
**REPORT OF INVESTIGATION**

| ADDRESSED TO:<br>S~~~cial Agent in Charge<br>C~~~ago Field Division | MONITORED INVESTIGATION INFORMATION:<br>Chicago Field Division<br>FY-04<br>Report 005 |
|---|---|

| TITLE OF INVESTIGATION:<br>Thomas L. Summers et. al. | | |
|---|---|---|

| CASE NUMBER:<br>772056-03-0105 | REPORT NUMBER:<br>5 |
|---|---|

**TYPE OF REPORT:** *(Check Applicable Boxes)*

| X | REPORT OF INVESTIGATION | | COLLATERAL REPLY |
|---|---|---|---|
| | REPORT OF INTELLIGENCE | | |

| SUBMITTED BY *(Name)*<br>Dennis A. Fritzsche | SUBMITTED BY *(Title and Office)*<br>Special Agent, Springfield I Field Office | SUBMITTED BY *(Date)*<br>10/09/2003 |
|---|---|---|
| REVIEWED BY *(Name)*<br>Peter A. Pappas | REVIEWED BY *(Title and Office)*<br>Resident Agent in Charge, Springfield I Field Office | REVIEWED BY *(Date)*<br>10-9-03 |
| APPROVED BY *(Name)*<br>~ .arry Ford | APPROVED BY *(Title and Office)*<br>Special Agent in Charge, Chicago Field Division | APPROVED BY *(Date)* |

## DESCRIPTION OF ACTIVITY:

Proffer Interview of John W. LEE

## SYNOPSIS:

On September 29, 2003, John W. Lee was interviewed at the United States Attorney's Office, Urbana, Illinois, pursuant to a grant of conditional direct use immunity, prepared by Assistant U.S. Attorney Timothy Bass. Lee was interviewed by Kankakee City Police Detectives Pat Kane and Peter Nicholos, and by Special Agent Dennis A. Fritzsche, Bureau of Alcohol, Tobacco and Firearms, Springfield, Illinois.

## NARRATIVE:

1.) John Lee stated that during the fall of 2002, Kim Austin approached him and wanted to borrow $200 to purchase a firearm from "Boonie" (Lee identified a photograph of Corie D. Coleman, produced by Detective Nicholos, as depicting "Boonie"). Lee stated that at the time, they were at Shawn Strong's (Andre) apartment on Juniper Street, in Rantoul, Illinois. Lee explained that either Kim Austin or Andre must have purchased the pistol from Boonie. Lee stated that he saw the pistol a day or so later. Lee described the firearm as being a black 9mm pistol with a red dot on the side of the frame. Lee then identified a photograph of a Hi-Point, Model C-9 Comp., 9mm semi-automatic pistol as looking like the same firearm he had seen at Andre's apartment. Lee stated that he believed that Kim Austin had been in an altercation and had received a broken nose, Lee stated that he believed that Austin wanted the firearm for his own protection.

DEPARTMENT OF THE TREASURY
BUREAU OF ALCOHOL, TOBACCO AND FIREARMS
## REPORT OF INVESTIGATION

Page 2 of 2

| ADDRESSED TO: | MONITORED INVESTIGATION INFORMATION: |
|---|---|
| Special Agent In Charge<br>Chicago Field Division | Chicago Field Division<br>FY-04<br>Report 005 |

**TITLE OF INVESTIGATION:**
Thomas L. Summers et. al.

| CASE NUMBER:<br>772055-03-0105 | REPORT NUMBER:<br>5 |
|---|---|

2.) John Lee stated that sometime later, Tovorie Gray (Bobbie) came to his apartment with the firearm, explaining that he wanted to sell it. Lee stated that he and his girlfriend and Tovorie Gray took the firearm to Kankakee, in hope of selling the firearm. Lee stated that the trio traveled to Kankakee in his (Lee's) mothers Pontiac Bonneville. Lee stated that he and Gray then traveled to "Leps" residence in Kankakee. Lee stated that Lep was related to his cousin, Joe Taylor (Yodi). Lee stated that he met with Taylor at the residence, showing Taylor the pistol, and telling him the Gray had hoped that he (Taylor) would purchase the firearm. Lee stated that Taylor and Gray then negotiated a price for the firearm, and indicted that Taylor purchased the firearm from Gray. Lee stated that Gray gave him $100.00 for arranging the sale of the firearm.

3.) John Lee stated that he didn't know anything more about the firearm until he heard that a police officer that attends the same church as his aunt had asked questions about the firearm. Lee stated that when he was approached by Officer Nicholos about the firearm, he still did not know that the firearm had been recovered at the scene of the murder of Steven Prendergast. Lee stated that he was concerned when he was approached by law enforcement concerning the firearm, indicating that he went and spoke with his cousin Joe Taylor. Lee stated that Joe Taylor told him that he wasn't going to let him take the rap for the shooting, explaining that Taylor told him that Antonio Sherrod had been responsible for the murder. Lee explained that he even heard that the shooting might have been a set-up. Lee said that he had been told by Jessica McKenzie (of Kankakee) that she was seeing Prendergast, and that he was supposed to be coming down to Kankakee to see her. Lee said that McKenzie told him that the victims father had called her and told her that the police were going to be coming after her.

4.) John Lee stated that while he was not on good terms with Joe Taylor at the present time, he felt that given the opportunity, Taylor would talk with him about the incident involving the firearm, and that he would detail his knowledge of Sherrod's involvement in the shooting. Lee stated that he might even be able to speak with Sherrod about the incident, if he was able to catch up with him (Sherrod). John Lee then went on to detail his knowledge of individuals involved in the sale of illegal drugs to Detectives Kane and Nicholos, the report documenting that information will be prepared by a representative of the Kankakee Detectives Bureau. Lee indicated that he would be available for additional interviews as required.

(A-20)

# Kankakee City Police Department
## Investigative Report

| Case Report # | Activity Date | Reporting Investigator |
|---|---|---|
| 03-1038 | 11-06-03 | Sgt. Nicholos |
| Offense | Original Case officer | Date of occurrence |
| Murder | McCarty | 11-25-03 |
| Purpose: | | |
| Follow-Up | | |

On 11-25-03 at around 9:30 a.m. Lt. Kane and I transported Joe Taylor to the U.S. Attorney's office in Urbana, Illinois to speak with Assistant U. S. Attorney Tim Bass. Taylor was read his Miranda Warning by Assistant U.S. Attorney Bass. He was advised of the federal charges which were pending against him. After explaining this to him he agreed to cooperate with the government. Upon speaking with Taylor he was asked what he knew about the Murder at the Amoco Gas Station in Kankakee. Taylor stated sometime around January he was at his cousin, Larry Gray's house. Taylor stated Gray lives in the apartments on Sunnyside and believes it is apartment number 7. He said he was also staying with Gray sometimes. He said John Lee came to him and told him he had a gun to sell him. Lee brought the gun inside the apartment and showed it to Taylor. Taylor described the gun as being black with some type of holes on the end of the barrel. He was then shown a picture of the gun and said that was the same gun Lee had given him. Taylor said he told Lee he didn't have any money to give him for the gun. Lee told him he was hurting for cash and Taylor could give him some money now and some later. Taylor stated he then decided to keep the gun there. Taylor stated the gun was loaded. He said he didn't give Lee any money for the gun and Lee left the apartment. Taylor stated the gun stayed over at the apartment until around mid-February. Taylor said Lee never asked him again for any money for the gun but a few days later Taylor gave Lee $150.00 to bond out his girlfriend in Rantoul, IL. Taylor said a couple weeks before the Murder the gun was stolen out of the apartment by Antonio Sherrod while Sherrod was in the apartment waiting to give Larry Taylor a ride. Taylor stated he called Sherrod to ask him if he stole the gun out of the apartment and Sherrod initially told him no but later told him he did take the gun. Sherrod told him he took the gun because Gray owed him some money. Taylor told Sherrod to bring the gun back and Sherrod told him he would but he never got the gun back. When Taylor called Sherrod again about the gun Sherrod told him the gun got caught up. Taylor stated caught up means the gun was used to do something and could not be recovered. Taylor stated he then read in the newspaper about the Murder and how a gun was recovered. Taylor also stated he read the description of the suspect and figured Sherrod probably Murdered the guy over some rims. Taylor stated he asked Sherrod if he did the Murder and Sherrod told him no. Taylor stated Sherrod never told him he committed the Murder and never really told him what happened to the gun. Taylor stated he put everything together from being on the streets for so long and figured Sherrod was trying to steal the truck for some rims. At around 3:00 p.m. Lt. Kane and I transported Taylor back to Kankakee, IL.

Sgt. McCarty

*misconduct / Perjury*

1     You will also hear evidence about the 9 millimeter

2   firearm.  Mr. Sherrod took that firearm from another convicted

3   felon.  His name is Joe Taylor.  You will hear from him.  As a

4   result of himself being a convicted felon, he was shot some

5   years ago and left paralyzed from the waist down.  He was in a

6   wheelchair at the time that this crime occurred, but he had

7   bought this 9 millimeter semiautomatic weapon, and he had left

8   it at his cousin's house, a man by the name of Larry Gray,

9   also a convicted felon.

10          These two men will tell you -- Mr. Taylor will tell

11  you that he's going to be charged with being a felon in

12  possession of that gun, and he's agreed to cooperate with the

13  government but because he hopes -- he hopes that he'll get

14  some benefit for that but that he has not been promised

15  anything.

16          And he won't tell you that he knows who committed

17  this murder.  He won't tell you that he sold the gun to

18  Antonio Sherrod.  All that he will tell you is that he bought

19  the gun.  He possessed it.  It was stolen or missing from

20  where he had left it at his cousin's house, and he confronted

21  the defendant about it.

22          The defendant first said he didn't take it.  When

23  Mr. Taylor confronted him again, the defendant told him,

24  "Well, I can get it."  *Remade or Retyped*

25          Mr. Gray will tell you he has no agreement with the

1        A    I asked him did he have the gun.  He said no.

2        Q    Did you say anything else to him?

3        A    Yeah.  I went on to tell him that my cousin Larry

4    say he was the one that there and that he's the one had to

5    take the gun.

6        Q    Did Mr. Sherrod say anything in response to that?

7        A    He said no; he didn't take the gun.

8        Q    Did he say anything about finding the gun?

9        A    Yeah.  He said that -- he asked me what kind of gun

10   it was, and I told him.  Then he say he probably -- he'd look

11   around, and he'd probably get it back.

12       Q    Mr. Taylor, let me show you Government Exhibit 5.

13   Do you recognize that?

14       A    Yes.

15       Q    How do you recognize it?

16       A    That's the gun my cousin left with me.

17            THE COURT:  That's Government Exhibit 5?

18            MR. BASS:  Yes, Your Honor.

19   BY MR. BASS:

20       Q    Do you recall sometime later hearing about an

21   incident at the Amoco gas station in Kankakee?

22       A    Yes.

23       Q    Did that incident at Amoco gas station, did that

24   occur before or after your conversation with Mr. Sherrod?

25       A    That was after.

1   a palm print of Mr. Prendergast after he died.

2          But there were nine prints inside that vehicle:

3   five fingers, four palms.  The four palms were printed twice;

4   so essentially it was two palm prints, both on the steering

5   wheel.  The five fingerprints -- four on the steering wheel,

6   one on the driver's door -- the only fingerprints inside that

7   vehicle belonged to the defendant.  The placement of those

8   fingerprints suggests conclusively, conclusively that the way

9   that he touched the inside of that vehicle was as a driver,

10   left hand, left ring finger, turning like he would turn left

11   off of St. Joseph's onto Birch, turning left; steering wheel

12   comes back around, you touch it with your palm and your left

13   ring finger, two different places.

14          In his neighborhood, his hair on the jacket a short

15   distance away next to the murder weapon.

16          Now, you heard also the testimony of Mr. Gray and

17   Mr. Taylor.  Only a fool would stand before you and say,

18   "Believe these guys because they said it," especially since

19   one of them has a motive to testify.

20          But the instructions say to you:  Don't disbelieve

21   them.  Consider their testimony with caution and great care.

22   That's what I ask you to do.  Consider their testimony with

23   caution and great care.

24          If these guys were lying, they would have -- you

25   would have to say that what they said has got to be the most

*He knew Yoddie was lying and didn't bring it out*

1   unbelievably inept attempt at lying.  They didn't say,

2   "Antonio Sherrod told me that he committed this murder.

3   Antonio Sherrod, I saw him with this gun.  Antonio Sherrod

4   told me that he stole this gun."  They didn't say any of that.

5   They just said what happened.

6           Joe Taylor said this:  I got this gun.  I got it.

7   Not the defendant.  I got the gun.  I was a felon at the time.

8   I left it over at my cousin's house, and I asked the defendant

9   about it.  Did Mr. Taylor say that the defendant said he took

10  it?  No.  He said that the defendant denied taking it.  Is

11  that the testimony of a liar?  He simply said that the

12  defendant said he could get it. *Misstating facts*

13          Mr. Gray testified in a similar manner, and he

14  said:  I saw the gun at my house.  It was left there; and the

15  only person that came over between the time that I saw it and

16  the time that I didn't see it anymore was the defendant.  Is

17  that a calculated lie by a guy in a county jail who's being --

18  who's getting nothing for being here?  Or is it just the       *no personal knowledge*

19  plain, simple truth?                                            *no facts at all*

20          Antonio Sherrod took that gun from Mr. Gray's

21  house, and he used it to murder Mr. Prendergast.

22          And finally, and probably most importantly, are the

23  defendant's statements.  What kind of man denies that his

24  fingerprints are in the vehicle?

25          What kind of man says, "You'll find no DNA on that

*now he trying to make yoddie credible by saying him he knew his when he changed his statements*

(A-24)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO. 04- _20001_ |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Car-Jacking, 18 U.S.C. § 2119(3); |
| | ) | Use of a Firearm to Commit First- |
| ANTONIO SHERROD, | ) | Degree Murder, 18 U.S.C. §§ 924(c), |
| | ) | (j)(1); Felon in Possession of a Firearm, |
| Defendant. | ) | 18 U.S.C. § 922(g)(1) |

## INDICTMENT

THE GRAND JURY CHARGES THAT:

### COUNT ONE
### (Car-Jacking With the Intent to Cause Death and Serious Bodily Harm)

On or about March 16, 2003, in Kankakee County, in the Central District of

Illinois, the defendant,

### ANTONIO SHERROD,

by force and violence and by intimidation, and with the intent to cause death and

serious bodily harm, did take from the person and in the presence of Steven

Prendergast a white 2003 Cadillac Escalade motor vehicle, which had been transported,

shipped, and received in interstate commerce, in that the defendant used a 9 millimeter

semi-automatic handgun to shoot and cause the death of Mr. Prendergast, in order to

steal Mr. Prendergast's Cadillac.

All in violation of Title 18, United States Code, Section 2119(3).

## COUNT TWO
### (Carrying and Using a Firearm to Commit First-Degree Murder)

On or about March 16, 2003, in Kankakee County, in the Central District of Illinois, the defendant,

### ANTONIO SHERROD,

did knowingly carry and use a firearm, namely a 9 millimeter semi-automatic handgun, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, in that the defendant carried and used the semi-automatic handgun to commit the first-degree murder (as defined in 18 U.S.C. § 1111(a)) of Steven Prendergast, in order to steal Mr. Prendergast's Cadillac motor vehicle, in violation of 18 U.S.C. § 2119(3), as set forth in Count One of this Indictment.

All in violation of Title 18, United States Code, Sections 924(c) and (j)(1).

2

## COUNT THREE
### (Felon in Possession of a Firearm)

On or about March 16, 2003, in Kankakee County, in the Central District of Illinois, the defendant,

### ANTONIO SHERROD,

after previously being convicted of a crime punishable by imprisonment for a term exceeding one year, did knowingly and unlawfully possess a firearm, which had previously been shipped or transported in interstate commerce.

All in violation of Title 18, United States Code, Section 922(g)(1).

A TRUE BILL,

_Susan C. Wood_
FOREPERSON

_Greg Harris for_
JAN PAUL MILLER
UNITED STATES ATTORNEY

TB

3

1    point when it completes, then the defense -- and, Mr. Beckett,

2    as I understand, the defense will present evidence?

3         MR. BECKETT:  That's correct, Your Honor.

4         THE COURT:  So that while I said to you yesterday

5    the defendant is not required to present evidence, in this

6    case there will be presentation of evidence.

7         So with the government's witnesses, Mr. Bass will

8    ask questions first, and then they will be cross-examined by

9    either Mr. Beckett or Ms. Dison.

10        During the presentation of defense evidence, Ms.

11   Dison or Mr. Beckett will ask the direct questions, and Mr.

12   Bass will cross-examine.

13        All of this will soon become very easy for you to

14   follow if you've never been in a trial before.

15        Does anybody know Ms. Riker in any way?  Okay.  If

16   so, raise your hand.  Since she wasn't here yesterday, I need

17   to do that first thing today.

18        Again, the statement of the case.  On March 16,

19   2003, in Kankakee, Illinois, in the Central District of

20   Illinois, Steven Prendergast was shot and died.  The

21   defendant, Antonio Sherrod, is charged with the offenses of:

22   One, car-jacking with the intent to cause death and serious

23   bodily harm; two, carrying and using a firearm during and in

24   relation to a crime of violence, namely first-degree murder;

25   and, three, unlawful possession of a firearm by a convicted

1    felon.  The defendant has demanded a trial by jury, pled

2    guilty -- pled not guilty to the charges, and that's what

3    brings you here today.

4              At the conclusion of the trial, you'll receive

5    three verdict forms on each of these charges; and at that

6    time, you'll weigh the evidence and determine whether the

7    government has met its burden of proving the defendant guilty

8    beyond a reasonable doubt on each of the three charges.  And

9    as I indicated to you yesterday, if the government fails to

10   meet its burden of proof beyond a reasonable doubt on any of

11   the three charges or all of the three charges, your verdict

12   must be not guilty.

13             Now that you've been sworn, I'll give you some

14   preliminary instructions to guide you in your participation in

15   the trial.

16             It will be your duty as jurors to find from the

17   evidence what the facts are.  You and you alone are judges of

18   the facts.  You will then at the conclusion of the case have

19   to apply those facts that you find to the law that I give you

20   at the conclusion of the case to aid you in your

21   deliberations.

22             You must follow the law that I give you, whether

23   you agree with it or not.  Nothing that I may say or do during

24   the course of this trial is intended or should be taken by you

25   in any way as indicating what your verdict should be.  You and

1   intentionally took a Cadillac Escalade from a person or the

2   presence of another person; second, the defendant did so by

3   means of force and violence or by intimidation; third, the

4   Cadillac Escalade had been transported, shipped, or received

5   in interstate commerce; and, fourth, the defendant intended to

6   cause death or serious bodily injury.

7           If you find from your consideration of all the

8   evidence that each of these propositions has been proved

9   beyond a reasonable doubt, then you should find the defendant

10  guilty.

11          If, on the other hand, you find from your

12  consideration of all the evidence that any one of these

13  propositions has not been proved beyond a reasonable doubt,

14  then you should find the defendant not guilty.

15          "Serious bodily injury" means injury that involves

16  a substantial risk of death, extreme physical pain, protracted

17  and obvious disfigurement, or protracted loss or impairment of

18  the function of a bodily member, organ, or mental faculty.

19          To sustain the charge of carrying or using a

20  firearm during and in relation to a crime of violence as

21  charged in Count 2 of the indictment, the government must

22  prove the following propositions:  First, that the defendant

23  committed the crime of car-jacking with the intent to cause

24  death or serious bodily harm as charged in Count 1 of the

25  indictment; and, second, that the defendant knowingly carried

1    or used a firearm during and in relation to that crime.

2              If you find from your consideration of all the

3    evidence that each of these propositions has been proved

4    beyond a reasonable doubt, then you should find the defendant

5    guilty.

6              If, on the other hand, you find from your

7    consideration of all the evidence that any one of these

8    propositions has not been proved beyond a reasonable doubt,

9    then you should find the defendant not guilty.

10             The term "firearm" means (A) any weapon (including

11   a starter gun) which will or is designed to or may readily be

12   converted to expel a projectile by the action of an explosive;

13   (B) the frame or receiver of any such weapon; (C) any firearm,

14   muffler, or firearm silencer; or (D) any destructive device.

15   Such term does not include an antique firearm.

16             A defendant uses a firearm when he actively employs

17   it in some way that is related to the violent crime that he is

18   committing.  "Use" may include firing or attempting to fire a

19   firearm.

20             A defendant carries a firearm when he transports

21   the firearm on his person or in a vehicle and does so during

22   and in relation to the violent crime that he is committing.

23             A firearm has traveled in interstate commerce if it

24   has traveled between one state and any other state or country

25   or across a state or national boundary line.  The government

A-27

**FILED**

OCT 1 9 2004

JOHN M. WATERS, CLERK
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

Judge McCuskey,                    10/19/04

We have two questions for you.

1.) Please define intent as it is used
in the Fourth Proposition on page 23.

    A.) Once a loaded gun is involved
in a crime is "intent" assumed?

2.) Please clarify: If the verdict in
count one is not guilty than
the verdict for count two must
be not guilty?

Ruth Vedisk
Foreperson

A11

Page 1491

1    involved in a crime, is intent assumed?

2              So we'll take up the questions sequentially.

3              The Court did look through the instructions and

4    neither side had proposed, nor did the Court, a definition of

5    intent.  Looking at 4.0 of the Seventh Circuit Criminal Jury

6    instructions of 1999, committee comment under 4.08, specific

7    intent/general intent, the committee recommends avoiding

8    instructions that distinguish between specific intent and

9    general intent.  In place thereof, the committee recommends

10   that instructions be given which define the precise mental

11   state required by the particular offense charged.

12   Accordingly, district judges should determine the requisite

13   mental state as to each element of the charged offense and

14   instruct thereon.

15             We did give an instruction relative to knowingly in

16   the -- but -- in the packet.

17             So, Mr. Bass, I'll let you comment first.

18             MR. BASS:  Well, Your Honor, I guess my initial

19   reaction to this is that these are three deliberative

20   questions which are answered by the instructions of law that

21   you've already given.  I don't believe there is a pattern

22   instruction on intent, unless I'm mistaken.

23             THE COURT:  I agree.

24             MR. BASS:  So that my initial thought is that your

25   response to these questions would be simply that "Please --

A12

1   please refer to the instructions of law that you have

2   previously been given."

3            THE COURT:  Well, this is -- so that's to the first

4   part.  I don't want to go to 2 until we complete 1 and 1A.

5            Ms. Dison.

6            MS. DISON:  I believe that the jury has already

7   begun their deliberation.  Prior to trial there was a

8   discussion.  We had a jury conference, and we decided what

9   instructions should go back to the jury.  At this point, I

10  don't believe it's proper after they've begun deliberation,

11  after they've been handed the case, to provide them with any

12  other instructions.

13           I think we should tell them that they have been

14  provided with the instructions in this case, and they should

15  refer to those instructions.

16           THE COURT:  So I think both of you are in

17  agreement, Mr. Bass.

18           MR. BASS:  I agree, Your Honor.

19           THE COURT:  Okay.  And the Court agrees with that

20  as to 1A.

21           Let me write that down before we talk about 2.

22               (Brief pause in proceedings.)

23           THE COURT:  Let's turn to the second question which

24  is, "Please clarify:  If the verdict in Count 1 is not

25  guilty" -- it's "than"; it should probably be "then" -- "than

1    the verdict for Count 2 must be not guilty?"

2            Mr. Bass.

3            MR. BASS:  Your Honor, my, my thought is the same

4    answer here.  That question is answered by the instructions

5    that you've already given.  So my suggestion to you in

6    response to all this would be that "You have been instructed

7    on the law in this case.  Please refer to those instructions

8    to answer your questions."

9            THE COURT:  Ms. Dison.

10           MS. DISON:  I agree with Mr. Bass, Your Honor.

11           THE COURT:  Okay.  The Court has written this

12   response, and I'll let you review it before we decide if it's

13   appropriate.  "The Court believes that you have been provided

14   with sufficient and complete instructions to assist you as you

15   deliberate on your verdicts.  Please review all of the Court's

16   instructions as you continue your deliberations."

17           Mr. Bass.

18           MR. BASS:  Fine, Your Honor.

19           THE COURT:  Ms. Dison.

20           MS. DISON:  Yes, Your Honor.

21           THE COURT:  Okay.  We'll send that in and show it

22   as, to the jury and I'll make copies before it goes in.

23           Sherry, you want to make copies, and then you can

24   take this in as a response.  But make copies for the record

25   and for counsel and then give Denny the original to take in.

A-29

FILED

OCT 1 9 2004

JOHN M. WATERS, CLERK
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

To the Jury : 3³⁷   Oct. 19 '04

The Court believes that you have been provided with sufficent and complete instructions to assist you as you deliberate on your verdicts. Please review all of the Courts instructions as you continue your deliberations.

Michael P. McCuskey
U.S. District Ct Judge

A15

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

**FILED**

**OCT 2 0 2004**

JOHN M. WATERS, CLERK
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

UNITED STATES OF AMERICA )
                                 )
         PLAINTIFF, )
                                 )
       v. )  CRIMINAL NO. 04-20001
                                 )
ANTONIO SHERROD, )
                                 )
        DEFENDANT. )

## <u>VERDICT FORM A</u>

    WE, THE JURY, FIND THE DEFENDANT, ANTONIO SHERROD,

_Guilty_____ OF THE OFFENSE OF CARJACKING WITH THE INTENT
(GUILTY, NOT GUILTY)

TO CAUSE DEATH OR SERIOUS BODILY HARM AS CHARGED IN COUNT ONE OF THE

INDICTMENT.

    IF YOU FIND THE DEFENDANT GUILTY OF THE OFFENSE OF CARJACKING

WITH THE INTENT TO CAUSE DEATH OR SERIOUS BODILY HARM AS CHARGED IN

COUNT ONE OF THE INDICTMENT, PLEASE ANSWER THE FOLLOWING QUESTIONS:

    1. DID THE DEFENDANT CAUSE THE DEATH OF THE VICTIM NAMED IN THE

INDICTMENT? _Yes_____ (YES/NO).

Page 1 of 2

A16

2. DID THE DEATH OF THE VICTIM OCCUR AS A CONSEQUENCE OF THE DEFENDANT KNOWINGLY ENGAGING IN THE CARJACKING, AS CHARGED IN COUNT ONE OF THE INDICTMENT? ___*yes*___ (YES/NO).

DATE: _October 20, 2004_



FOREPERSON

Page 2 of 2

A17

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

**FILED**

OCT 2 0 2004

JOHN M. WATERS, CLERK
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| v. | ) CRIMINAL NO. 04-20001 |
| | ) |
| ANTONIO SHERROD, | ) |
| | ) |
| DEFENDANT. | ) |

## VERDICT FORM B

WE, THE JURY, FIND THE DEFENDANT, ANTONIO SHERROD,

_Guilty_____ OF THE OFFENSE OF CARRYING OR USING A FIREARM
(GUILTY, NOT GUILTY)

DURING AND IN RELATION TO A CRIME OF VIOLENCE, AS CHARGED IN COUNT

TWO OF THE INDICTMENT.

IF YOU FIND THE DEFENDANT GUILTY OF THE OFFENSE OF CARRYING OR

USING A FIREARM DURING AND IN RELATION TO A CRIME OF VIOLENCE, AS

CHARGED IN COUNT TWO OF THE INDICTMENT, PLEASE ANSWER THE

FOLLOWING QUESTIONS:

1. DID THE DEFENDANT CAUSE THE DEATH OF THE VICTIM NAMED IN THE

INDICTMENT? _yes_____ (YES/NO).

Page 1 of 2

A18

2. DID THE DEATH OF THE VICTIM OCCUR AS A CONSEQUENCE OF THE DEFENDANT KNOWINGLY ENGAGING IN THE CARJACKING, AS CHARGED IN COUNT ONE OF THE INDICTMENT? _yes_ (YES/NO).

DATE: _October 20, 2004_

Donna Cole

Lori Bateman

Angela J. Koehler

Jennif Peddycoart

Heather Paige

Lynn Poindexter

Marilyn Mulvaney

Christy Brumfield

Cathy Schulte

_____

Ruth A. Verduit

**FOREPERSON**

Page 2 of 2

A19

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

**FILED**

OCT 2 0 2004

JOHN M. WATERS, CLERK
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-20001 |
| | ) | |
| ANTONIO SHERROD, | ) | |
| | ) | |
| DEFENDANT. | ) | |

**<u>VERDICT FORM C</u>**

WE, THE JURY, FIND THE DEFENDANT, ANTONIO SHERROD,

_____*Guilty*_____ OF THE OFFENSE OF KNOWINGLY POSSESSING A
(GUILTY, NOT GUILTY)

FIREARM WHICH HAD PREVIOUSLY BEEN SHIPPED OR TRANSPORTED IN

INTERSTATE COMMERCE, AFTER HE WAS PREVIOUSLY CONVICTED OF A CRIME

PUNISHABLE BY IMPRISONMENT FOR A TERM EXCEEDING ONE YEAR, AS

CHARGED IN COUNT THREE OF THE INDICTMENT.

DATE: _*October 20, 2004*_

_[signatures]_

FOREPERSON

**A20**



# Kankakee City Police Department
## Statement Form

Case: 03 1038
Date: 03-21-03
Time: 3:40 pm
Name: Guttendorf, Shay C.
       1840 E. Court St. (Amoco)
       Kankakee, IL

Phone: hm 937-5739        Dob: 09-18-75

On Sunday, 03-16-03, I worked 4pm-12am at Amoco.
I remember Demetria Sales was leaving work at about 11:40 pm, and that's when a cream colored Cadillac Escalade pulled up to pump 5 and a red car pulled up next to it at pump 6. The guy got out of the Cadillac and he came in and pre-payed $20.00 for gas, and he went into the bathroom for a while. That guy was a black male wearing a light brown or tan outfit. While he was inside a black female got out of the front passenger side of the Cadillac and walked around to the driver's side and opened the door, and then she walked over to the red car and she got in. Then she got out, and the time that the guy came out of the bathroom, and she was looking into the store. Then the guy walked outside, and I'm not sure who actually pumped the gas.
Then the guy came in and bought something for 52 cents total, with tax; I think it was a cigar, and then went back outside.
Then he walked to the driver's side of the Cadillac and the guy and girl met at the corner of the Cadillac and she walked around and got in the front passenger seat, and he got into the driver's seat. I saw the passenger side shut, and the driver's door was partially open and all of a sudden I saw a guy wearing a black hoody standing next to the driver's door; actually partially inside of the driver's door. Then I heard a gunshot, because the door to the store was propped open, and then the driver of the Cadillac hit the ground. Then the guy wearing the hoody got into the Cadillac and drove away. He drove forward and then turned to the left, and by that time the victim had gotten up and ran around the pumps over to area in the middle of the pumps to the east. Then the Cadillac went north on St. Joseph. Then a red or maroon car pulled up right next to the victim.
The guy wearing the black hoody looked like he was about as tall as the guy that had gotten shot; maybe about 5'10", thin build.
This statement is true and was typed for me by Sgt. Lowman as I told it to him.

SGT.

DEFENDANT'S EXHIBIT

Page 1 of 1

# Kankakee City Police Department
## Statement Form

**Date:** 12/16/03
**Case:** 2003-1038
**Time:** 11:45 a.m.
**Name:** Guttendorf, Shay C.
     550 S. Poplar
     Kankakee, IL. 60901
     09/18/75    935-3045

My name is Shay Guttendorf. I work at Aquativa in Bradley. I used to work at the Amoco station in Kankakee, and I worked there the night of the shooting that happened. I came in today because I was asked to come in and speak with investigators about this case. When I got here, I met with Lt. Kane and he asked me if I had read the papers or saw a picture of the person who has been arrested. I have read the papers about this case, but that was back when it happened. I haven't read anything recently though and I haven't looked at any pictures of anyone in the paper.

Lt. Kane asked if I could remember anything now that wasn't in my original statement. The only thing I can think of is that I did see the man's face who did the shooting. I also saw his hands and I don't believe that he didn't have any gloves on his hands. I say that because his hands looked too much like skin tone and not gloves. I can remember that even with his hood up, I could see his face enough to see his nose, cheek bone area, eyes and mouth area. I can remember that his hands appeared to be the same tone as his face, that's why I don't believe that he had gloves on his hands.

I can also remember that he was very thin. When he was turned sideways, I could see that his clothes hung straight down like he was real thin. I could tell his legs were thin too.

Lt. Kane has asked me if I think I could identify him if I saw him again, and I think I could if I saw them in person.

Lt. Kane brought Det. Alrandi into the room and I was read an instruction from the sheet. I said that I understood the instructions and that the person who is being investigated for this case may not be in the line up. I looked at six different photo's and I said that the person in #3 looks like the guy I saw that night who did the shooting. I believe that is the person I saw there that night. I know that if I saw him in a standing position where I could see his entire body there would be no doubt in my mind whatsoever. Right now, I believe that the person in #3 is the right person based just on his face. After I looked at the photo line up, I filled out the sheet and signed the bottom, and then Det. Alrandi signed the bottom. Lt. Kane then took this statement

I don't remember seeing him in there before that night, and I don't remember seeing him around the business before this happened.

I have not been persuaded in any way to make this statement, and I have not been persuaded in any way during the photo line up. I was told that if I was not sure, that I should say so. I am sure and that is why I signed the form and filled it out.

**This statement is true and correct and was typed for me by Lt. Kane as I told it to him.**

_Patrick Kane, Det. Lt._                                _Shay C. Guttendorf_

GOVERNMENT
EXHIBIT
38
04-20001