**E-FILED**
Tuesday, 15 April, 2008  07:48:30 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| ANTONIO SHERROD, | ) | |
| | ) | |
| Petitioner, | ) | |
| vs. | ) | Case No. 08-2013 |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |

## GOVERNMENT'S RESPONSE TO PETITIONER'S
## MOTION UNDER 28 U.S.C. § 2255 AND MOTION FOR DISCOVERY

The United States of America, by its attorneys, Rodger A. Heaton, United States

Attorney for the Central District of Illinois, and Timothy A. Bass, Assistant United

States Attorney, respectfully submits its response to the petitioner's motion under 28

U.S.C. § 2255 and motion for discovery. In opposition to the motions, the government

states the following:

## PROCEDURAL HISTORY

1.      On January 14, 2008, the petitioner filed a motion to vacate, set aside or

correct sentence under 28 U.S.C. § 2255.  The prior proceedings involving the petitioner

include the following:

2.      On December 21, 2004, the petitioner was indicted for the offense of Car-

Jacking With the Intent to Cause Death and Serious Bodily Harm, in violation of Title

18, United States Code, Section 2119(3) (Count 1); Carrying and Using a Firearm to

Commit First-Degree Murder, in violation of Title 18, United States Code, Sections

924(c) and (j)(1) (Count 2); and Felon in Possession of a Firearm, in violation of Title 18,

United States Code, Section 922(g)(1).[1]

3.      On October 20, 2004, following the petitioner's conviction in a jury trial,

the petitioner was sentenced for the car-jacking and use of firearm offenses to two

consecutive terms of life imprisonment and to 10 years of imprisonment for the felon-

in-possession offense, to be served concurrently to the sentence imposed for the car-

jacking offense, ordered him to pay restitution of $3,408, and imposed a $300 special

assessment

4.      On April 27, 2006, the Seventh Circuit affirmed the petitioner's conviction.

United States v. Sherrod, 445 F.3d 980 (7th Cir. 2006).

5.      On August 23, 2006, the petitioner's request for rehearing and suggestion

for rehearing en banc was denied.

6.      On February 27, 2007, the petitioner's petition for a writ of certiorari was

denied. Sherrod v. United States, 127 S.Ct. 1304 (2007).

## FACTS

7.      In March 2003, the petitioner murdered 24-year-old Stephen Prendergast

during a car-jacking. (Tr.639-713,1103-39) Prendergast was stopped at a gas station en

route to Parkland College in Champaign, Illinois, as he was escorting his girlfriend and

---

[1] The statement of procedural history is based on this court's docket sheet in the criminal and civil cases involving the petitioner: Nos. 04-20014 and 08-CV-2013; references to the transcript of the criminal trial are to "Tr.___"; references to government exhibits admitted at trial are to "Gov.Ex.___".

two other young students back to school. (Tr.639-713,1103-39) The petitioner walked up to the driver's side door of Prendergast's 2003 Cadillac Escalade and shot him at point-blank range. (Tr.639-713,1103-39) Prendergast died a short while later from the bullet that pierced his heart. (Tr.893-99,925-29,1041-47)

8.     Prendergast was a resident of Matteson, Illinois, north of Kankakee. (Tr.1106) His girlfriend was Regan Booker, who also lived in Matteson. (Tr.1103-09) Regan Booker, Loren Booker (Regan's sister), and Loren's friend, Tiffany Sanders, attended Parkland College in Champaign, Illinois. (Tr.987-1007,1067-90,1103-39) They often traveled back and forth between Matteson and Champaign. (Tr.987-1007,1067-90,1103-39)

9.     On March 16, 2003, Prendergast, Regan and Loren Booker, and Tiffany Sanders departed from Matteson on their way to Champaign. (Tr.987-1007,1067-90,1103-39) Prendergast and Regan Booker rode in Prendergast's Escalade, while Loren Booker and Sanders traveled in a second car. (Tr.987-1007,1067-90,1103-39)

10.     Shortly before midnight, the group stopped at the Amoco gas station in Kankakee. (Tr.987-1007,1067-90,1103-39) Prendergast parked his Escalade near one of the gas pumps. Sanders parked the second car on the opposite side of the same pump island. Prendergast then entered the adjacent convenience store, while the others waited outside. (Tr.987-1007,1067-90,1103-39)

11.     While Prendergast was in the store, a tan or gold Dodge Intrepid arrived at the gas station, slowly circled around the Escalade, and parked at an adjacent pump

3

island. (Gov.Ex. 16A,16B,17;Tr.748-64) The petitioner, who was a back seat passenger, got out of the car, approached the front of the store and then returned to the car, which had pulled up to the store to meet him. After the petitioner (who was wearing a black Carhartt jacket) got back into the car, it again drove slowly past the Escalade and left the gas station. (Gov.Ex.16A,16B,17)

12.    Shortly after the Intrepid departed from the gas station, Prendergast left the store and returned to the Escalade. (Gov.Ex.16A,16B,17;Tr.639-713,1103-39) Immediately after Prendergast and Regan Booker entered the Escalade, the petitioner, brandishing a 9 mm gun, confronted Prendergast at the driver's door and shot him through the left arm. (Gov.Ex.16A,16B,17;Tr.639-713,1103-39) (Tr.1103-39) The bullet traveled through Prendergast's arm and into the left side of his lower chest, piercing his heart. (Tr.893-99,1041-47)

13.    Regan Booker jumped out of the Escalade, ran to the back, and peered around the vehicle to where the petitioner and Prendergast were standing. (Gov.Ex.16A, 16B,17;Tr.639-713,1103-39) The petitioner demanded the keys to the Escalade and attempted to shoot Prendergast a second time, but the gun malfunctioned. (Tr.987-1007,1067-90,1103-39) Regan Booker saw the petitioner's face as Prendergast, who was doubled over, slid the Escalade's keys to him. (Tr.987-1007,1067-90,1103-39) As the petitioner fled the gas station in the Escalade, Prendergast collapsed on the gas station lot. (Gov.Ex.16A,16B,17;Tr.639-713,1103-39;Def.App.149) The entire incident was witnessed by Shay Guttendorf, a store employee, who called 911. (Tr.639-713) It was

4

also captured on video by the store's security system. (Gov.Ex.16A,16B,17)

14.    Within minutes after the 911 call, an ambulance and law enforcement officers arrived. (Gov.Ex.16A,16B,17;Tr.639-713,890-93,1103-39) Prendergast was rushed to the hospital but died a short time later from the single gunshot wound. (Tr.890-99,925-29,1041-47) A bullet fragment was found inside his pants. (Tr.925-29) Meanwhile, officers located the Escalade, which had been abandoned in an area north of the gas station. (Tr.775-863,886-89) In addition, officers found the handgun used in the shooting and a Carhartt jacket in the grass near the vehicle. (Tr.775-863)

15.    In the months that followed, the physical evidence that was discovered led to the petitioner's identification as a suspect in the shooting. (Tr.1245-93) A fingerprint analysis determined that the petitioner's fingerprints were found inside the Escalade, on the steering wheel and the driver's door. (Tr.900-912,1149-87) A tracing of the handgun found near the Escalade revealed that the petitioner had stolen it just weeks prior to the shooting. (1048-60,1216-34) A forensic analysis of the bullet fragment that caused Prendergast's death determined that it matched the handgun. (Tr.934-54) Finally, an analysis of DNA retrieved from hair found on the Carhartt jacket revealed that the petitioner could not be excluded as a source for the DNA, which could only have come from a person within a group comprising .25% of the North American population. (Tr.929-32,957-83)

16.    In late-2003, following the results of the fingerprint analysis and after the handgun had been traced, Regan Booker and Guttendorf were shown a six-person

photo array that contained the petitioner's photograph. (Tr.639-713,954-57,1103-39,1241-45,1245-86,1310-16) Both women identified the petitioner as the person who shot Prendergast. (Tr.639-713,954-57,1103-39,1241-45,1245-86,1310-16)

17.     On December 8, 2003, the petitioner was charged in a criminal complaint, arrested on that same date, and taken to the Kankakee Police Department. (R.1,R.29;Tr.84-87,114-18) Lieutenant Pat Kane of the police department and ATF Special Agent Dennis Fritzsche planned to interview the petitioner, but first they activated a video recorder and attempted to administer written *Miranda* warnings to him. (Tr.87-90,114-18,138-42;Supp.Ex.1,2;R.29)

18.     The petitioner was upset about being arrested and asked "what's this all about, man?" (Supp.Ex.2) Kane responded that he would discuss the case after he had completed the written warnings. (Supp.Ex.2) When Kane asked if the petitioner would consent to a recorded interview, he refused. The petitioner asked what he was charged with and stated "first, you gotta tell me what's going on." (Supp.Ex.2) When the petitioner again asked what he was charged with, Kane asked Fritzsche if he knew the exact charge, to which Fritzsche responded "no." (Supp.Ex.2)

19.     After Kane continued to advise the petitioner that he (Kane) was first required to administer the written warnings, the petitioner became increasingly agitated. Expressing his frustration, the petitioner stated "yo'all talk to me, man, what's up?" (Supp.Ex.2) He further stated "take me to jail, I'm not gonna talk about nothin' man." Finally, the petitioner stated that unless the officers gave him "a picture or

6

something of what's going on," he was "not going to talk about shit." Kane again

responded that he would discuss the case after the warnings were completed and asked

the petitioner if he understood and if he would consent to the recording. (Supp.Ex.2)

The petitioner acknowledged that he understood but refused to consent to a recording,

stating that anything he said "I do not want recorded." When the petitioner asked that

the recorder be turned off, officers complied. (Supp.Ex.2;Tr.87-90,114-18,138-42;R.29)

Once the recording was turned off, Kane completed the written warnings and advised

the petitioner that he was under arrest for car-jacking and murder. The petitioner then

executed a written *Miranda* waiver and agreed to be interviewed. (Supp.Ex.1,2;

R.29;Tr.97-100,114-18,138-142,1245-86)

20.    During the interview, the petitioner first denied that he had ever been

inside the Cadillac Escalade. (Tr.1278) Without being told about the evidence against

him, the petitioner stated "I'll bet the video don't show my real face, do it?" (Tr.1280)

He also denied that his fingerprints would be found on the gun or in the vehicle.

(Tr.1281) Finally, the petitioner stated that the woman in the front seat of the vehicle

"can't identify me[,]" and stated that you "[c]an't trust those whores at the gas station."

(Tr.1282,1285) After less than 15 minutes, the petitioner invoked his right to counsel,

and the interview was terminated. (R.29;Tr.100)

21.    On December 9, 2003, the petitioner was transported to the federal court

building in Urbana. (R.29;Tr.101) After the petitioner was secured in the lock-up facility,

Special Agent Fritzsche was advised by a Deputy U.S. Marshal that the petitioner was

7

highly agitated, and that there was a concern that he was attempting to injure himself. (R.29;Tr.118-20,1304-06) The deputy requested that Fritzsche talk to the petitioner and attempt to calm him down. After Fritzsche approached the petitioner's cell, the petitioner volunteered that he should not be in trouble if he had only tried to steal the radio. (R.29;Tr.118-20,1304-06)

22.     Later in the day on December 9, the petitioner made an initial appearance on the complaint. (docket entry 12/9/03) The magistrate judge appointed the Federal Public Defender to represent him and continued the preliminary and detention hearings to a future date. (docket entry 12/9/03) Later that same day, this Court discharged the Federal Public Defender and specially appointed two experienced criminal defense attorneys, J. Steven Beckett and Carol Dison of Beckett & Webber P.C., Urbana, Illinois. (docket entry 12/9/03) This Court chose Mr. Beckett because of his criminal defense experience, the nature of the case, and the potential for the government to seek a death sentence. This Court granted Mr. Beckett's request that Ms. Dison be allowed to serve as co-counsel. (docket entry 12/9/03;Tr.1576-77)

23.     On January 7, 2004, the petitioner was charged in a three-count indictment. (R.11) Count 1 charged that the petitioner, by force, violence, and intimidation, and with the intent to cause death and serious bodily harm, did take from Steven Prendergast a 2003 Cadillac Escalade, which had been transported in interstate commerce, in that the petitioner used a 9 mm handgun to shoot and cause the death of Prendergast, in order to steal his Cadillac, in violation of 18 U.S.C. § 2119(3). Count 2

8

charged the petitioner with carrying and using a firearm to commit the first-degree

murder (as defined in 18 U.S.C. § 1111(a)) of Prendergast, in order to steal his Cadillac,

as charged in Count 1, in violation of 18 U.S.C. § 924(c) and (j)(1). (R.11)

24.     Prior to trial, the petitioner, as an indigent defendant, sought funds from

the Court for the hiring of a DNA expert to conduct an examination of the jacket found

near the Escalade for the presence of DNA evidence. That request was allowed. (See

docket entry 8/31/2004) As later established at trial, the testimony of the DNA expert

established the petitioner as a possible, if not likely, source for DNA retrieved from the

jacket.

25.     On April 23, 2004, the petitioner filed a motion to suppress his post-arrest

statements. (R.20) The petitioner argued that he was improperly advised of his

*Miranda* rights, the officer's continued to interrogate him after he invoked his right to

remain silent, and his statements were involuntary. (R.20;Tr.120-38)

26.     On July 1, 2004, this Court conducted an evidentiary hearing on the

petitioner's motion. (Tr.83-142) The government presented the video recording

following the petitioner's arrest and his written *Miranda* waiver. (Supp.Ex.1,2)

Lieutenant Kane and Special Agent Fritzsche testified that the petitioner was advised of

his rights, and that he voluntarily made statements concerning the offense after waiving

his rights but prior to invoking his right to counsel. (Tr.83-129) Fritzsche also testified

that the petitioner made unsolicited statements on the day following his arrest. (Tr.114-

25)

9

27.    This Court denied the petitioner's motion, both orally at the conclusion of

the hearing and in a subsequent written order. (Tr.138-42;R.29) This Court found both

Kane and Fritzsche to be credible witnesses. (Tr.138-42;R.29) In addition, this Court

ruled that the officers did not engage in any improper coercive conduct. Relying on this

Court's decision in *United States v. Banks*, 78 F.3d 1190 (7th Cir. 1996), this Court also

ruled that the petitioner, while clearly agitated about being arrested, did not make a

"clear, unambiguous assertion of his right to remain silent." (R.29) Finally, this Court

ruled that the petitioner's statements were voluntary. (Tr.138-42;R.29)

28.    At trial, the government presented the video recording of the car-jacking,

the physical evidence, eyewitness testimony, and the petitioner's post-arrest statements.

(Tr.639-1316)

29.    The petitioner did not dispute that the Cadillac Escalade had been

manufactured outside of Illinois. (Tr.631-36,1286-91,1455-74) He also did not dispute the

physical evidence, the qualifications of the government's expert witnesses, or the fact

that a car-jacking or first-degree murder had occurred. The petitioner instead

emphasized that his face was not revealed on the gas station video, challenged the

credibility of the eyewitness testimony, and argued that he merely happened upon the

Escalade after the car-jacking and tried to steal the radio. (Tr.1455-74)

30.    During the jury instruction conference, the government tendered an

elements instruction for the car-jacking offense. (R.42,R.46,R.65,R.66;Tr.1359-1414) The

parties agreed that the government was required to prove that: 1) the petitioner

10

intentionally took a Cadillac Escalade from a person or the presence of another person; 2) the petitioner did so by means of force and violence or by intimidation; 3) the Cadillac Escalade had been transported, shipped, or received in interstate commerce; and 4) the petitioner intended to cause death or serious bodily injury. The parties also agreed to the definition of serious bodily injury and to an instruction containing the indictment. (R.42,R.46,R.65,R.66;Tr.1359-1414)

31.     In addition, the government tendered an elements instruction for the use of a firearm offense. (R.42,R.46,R.66;Tr.1359-1414) The parties agreed that the government was required to prove that: 1) the petitioner committed the crime of car-jacking with the intent to cause death or serious bodily harm, as charged in Count 1 of the indictment; and 2) the petitioner knowingly carried or used a firearm during and in relation to that crime. (R.42,R.46,R.65,R.66;Tr.1359-1414)

32.     Finally, the government and the petitioner agreed as to the forms of special verdicts for the car-jacking and use of firearm offenses. (R.65,R.66;Tr.1359-1414) The parties agreed that, in the event the jury returned a guilty verdict for either offense, the jury should answer yes or no to the following interrogatories for each verdict:

> 1) Did the defendant cause the death of the victim named in the indictment?
>
> 2) Did the death of the victim occur as a consequence of the defendant knowingly engaging in the carjacking or as charged in Count One of the indictment?

(R.42,R.46,R.66;Tr.1359-1414)

11

33.    This Court instructed the jury in accordance with the agreed-upon instructions and special verdicts. (R.66;Tr.1414-30)

34.    During its deliberations, the jury submitted written questions to this Court:

> We have two questions for you:
>
> 1.)    Please define intent as it is used in the Fourth Proposition on page 23.
>
> > A.)    Once a loaded gun is involved in a crime, is "intent" assumed?
> >
> > B.)    Please clarify: If the verdict in count one is not guilty than [sic] verdict in count two must be not guilty?

(R.67;Tr.1490-91)

During a conference in response to the jury's inquiry, this Court asked the parties for proposed answers to the questions. (Tr.1489-1502) The government suggested that this Court simply refer the jury to the instructions it had previously been given. (Tr.1492-93) The petitioner's counsel agreed. (Tr.1492-93) In addition, the petitioner's counsel stated:

> I believe that the jury has already begun their deliberation. Prior to trial there was a discussion. We had a jury conference, and we decided what should go back to the jury. At this point, I don't believe it's proper after they've begun deliberation, after they've been handed the case, to provide them with any other instructions.
>
> I think we should tell them that they have been provided

12

> with the instructions in this case, and they should refer to
> those instructions.

(Tr.1492)

35.    This Court's supplemental instruction advised the jury that it had been provided with sufficient and complete instructions to assist the jury as it deliberated on the verdicts. (R.68) This Court further instructed the jury to review all of the instructions as it continued its deliberations. (R.68) The government and the petitioner agreed to this supplemental instruction. (Tr.1493)

36.    On October 20, 2004, the jury found the petitioner guilty as charged on all counts in the indictment. The jury answered "yes" to each of the interrogatories in the special verdicts. (R.69,R.70)

37.    In his sentencing commentary, which followed the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005), the petitioner acknowledged that he "face[d] a sentence of life in prison for each of his convictions under Count 1 and Count 2[,]" and that, "[u]nder the Guidelines, [he] would receive a life sentence for Count 1 and Count 2." (Def.App.195-96) The petitioner's only arguments were that this Court should exercise its post-*Booker* discretion to sentence him to less than life imprisonment, and that a consecutive sentence was not mandated for the use of firearm offense under 18 U.S.C. § 924(c) and (j)(1). (Def.App.196-205)

38.    At sentencing, the government and the petitioner agreed that the petitioner faced statutory maximum sentences of life imprisonment for the car-jacking

13

offense and 10 years to life imprisonment for the use of firearm offense. (Tr.1511-37;R.85,R.88) In addition, the parties agreed that: 1) the first-degree murder Sentencing Guideline under USSG § 2A1.1 applied to the calculation of the offense level for both offenses; 2) the final offense levels were 43; and 3) the advisory Sentencing Guidelines ranges for both offenses was life imprisonment. (Tr.1511-37;R.85,R.88) Finally, the petitioner repeated his arguments that this Court should sentence him to less than life imprisonment, and that a consecutive sentence was not mandated under 18 U.S.C. § 924(c) and (j)(1). (Tr.1511-37,1565-67) After being addressed personally by this Court, the petitioner stated that he did not wish to assert any additional objections. (Tr.1531-32)

39.    This Court adopted the probation office's findings and the parties' agreement that the petitioner faced advisory Sentencing Guidelines ranges of life imprisonment for the car-jacking and use of firearm offenses. (Tr.1511-37) Relying on *United States v. Battle*, 289 F.3d 661 (10th Cir. 2002), and *United States v. Allen*, 247 F.3d 741 (8th Cir. 2001), *judgment vacated on other grounds*, 536 U.S. 953 (2002), this Court ruled that a consecutive sentence was mandated for the use of firearm offense under 18 U.S.C. § 924(c) and (j)(1). (Tr.1526)

40.    Exercising its post-*Booker* discretion to impose a reasonable sentence, this Court stated:

> This is overwhelming evidence of guilt. The right man's on trial, and the right man's been convicted beyond a reasonable doubt in this case. There's no question about that.

14

. . .

This just isn't a run-of-the-mill murder case. It's an
execution. For what? A car? And the evidence did show that
if the first bullet didn't severely injure or kill Steven
Prendergast at a point where you could have taken the car
easily, no, let's try to shoot again. It was almost as if the car
was an afterthought, and the execution and murder of
Steven Prendergast was exactly what was going on.

. . .

The videotape in this case is just clear, cold, and startling;
and within a period of a few seconds, a premeditated,
stalked, eyeballed, cold execution takes place on videotape.
No need to kill Mr. Prendergast whatsoever. The vehicle, if
that was the reason, could have been taken easily.

It's not an accident. It's intentional execution in cold blood[.]

(Tr.1577,1580,1586)

41.     This Court sentenced the petitioner for the car-jacking and use of firearm

offenses to two consecutive terms of life imprisonment and to 10 years of imprisonment

for the felon-in-possession offense, to be served concurrently to the sentence imposed

for the car-jacking offense, ordered him to pay restitution of $3,408, and imposed a $300

special assessment. (R.91)

## ARGUMENT

42.     A § 2255 motion to vacate, set aside or correct a sentence may be brought

by a "prisoner in custody under sentence of a court established by Act of Congress

claiming the right to be released upon the ground that the sentence was imposed in

violation of the Constitution or laws of the United States." 28 U.S.C. § 2255. It is well

settled, however, that a § 2255 motion is "neither a recapitulation of nor a substitute for a direct appeal." Daniels v. United States, 26 F.3d 706, 711 (7th Cir. 1994). As a result, constitutional errors not raised on direct appeal may not be advanced in a § 2255 motion unless the petitioner can establish that there is cause for the failure and actual prejudice therefrom or that the district court's refusal to consider the claims would result in a fundamental miscarriage of justice. McCleese v. United States, 75 F.3d 1174, 1177 (7th Cir. 1996).

43.     A claim of ineffective assistance of counsel is appropriate to bring in a § 2255 motion. To prevail on such a claim, however, a defendant must show that his attorney's performance was objectively unreasonable and that such performance prejudiced the petitioner. See, e.g., Hill v. Lockhart, 474 U.S. 52, 57 (1985); Strickland v. Washington, 466 U.S. 668, 687-88 (1984). Courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Galowski v. Berge, 78 F.3d 1176, 1180 (7th Cir. 1996). A petitioner "must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689. A petitioner will prevail only by demonstrating a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

44.     An evidentiary hearing on a § 2255 motion is not mandatory." Prewitt v. United States, 83 F.3d 812, 819 (7th Cir. 1996); see Daniels v. United States, 54 F.3d 290, 293 (7th Cir. 1995). An evidentiary hearing may be denied if "the record conclusively

16

demonstrates that the petitioner is entitled to no relief." <u>Prewitt</u>, 83 F.3d at 820. "[I]t is

the rule of [this circuit, however,] that in order for a hearing to be granted, the petition

must be accompanied by a detailed and specific affidavit which shows that the

petitioner ha[s] <u>actual proof</u> of the allegations going beyond mere unsupported

assertions." <u>Prewitt</u>, 83 F.3d at 819 (emphasis added). "Mere unsupported allegations

cannot sustain a petitioner's request for a hearing." <u>Id.</u> Likewise, "[a] petition under

[§] 2255 must set forth facts as distinguished from mere conclusion." <u>United States v.</u>

<u>Mathison</u>, 256 F.2d 803, 805 (7th Cir. 1958). "A petitioner's allegation supported only by

his own assertions [is] not sufficient." <u>Id.</u>; <u>see also</u> <u>Humphrey v. United States</u>, 896 F.2d

1066, 1070 (7th Cir. 1990) ("mere unsupported allegations do not warrant a hearing.");

<u>United States v. Lowe</u>, 367 F.2d 44, 45-46 (7th Cir. 1966) (§ 2255 petition found deficient

because it "does not show that [petitioner] has proof sufficient . . .").

**<u>Petitioner's Claims</u>**

       45.     In his handwritten § 2255 motion, the petitioner raises a number of claims

of ineffective assistance of trial counsel and other claims. Not one of these claims raises

any question as to what this Court described as "overwhelming" evidence of the

petitioner's guilt or its conclusion that "the right man's been convicted beyond a

reasonable doubt in this case. There's no question about that." That evidence included

1) two independent witnesses (Regan Booker and Shay Guttendorf) who identified the

petitioner as the person who shot Stephen Predergast; 2) the petitioner's fingerprints

were found inside the Escalade, on the steering wheel and the driver's door; 3) a tracing

of the handgun found near the Escalade revealed that the petitioner had stolen it just

weeks prior to the shooting; 4) an analysis of DNA retrieved from hair found on the

Carhartt jacket seized near the Escalade revealed that the petitioner could not be

excluded as a source for the DNA, which could only have come from a person within a

group comprising .25% of the North American population; and 4) the petitioner's

admissions following his arrest. Thus, even assuming any potential error in his trial

counsel's performance, the petitioner cannot possibly show that there is a reasonable

probability that any such error could have affected the outcome of his trial.

Claims 1A, 1B, 1C

46.    The petitioner first argues that his trial counsel was ineffective in failing to

challenge the validity of the government's evidence that the gold or tan Intrepid used in

the murder was owned by Dawn Ward, a girlfriend of Derrick Crawford, who was a

friend of the petitioner.

47.    At trial, the government's evidence, including the video evidence,

established that the person who shot Prendergast had emerged from a tan or gold

Dodge Intrepid that had arrived at the gas station, slowly circled around Predergast's

Escalade, and parked at an adjacent pump island. (Gov.Ex. 16A,16B,17;Tr.748-64)

Through the testimony of Lieutenant Kane and Lakeshia Winfield, the government

presented evidence to establish that the gold or tan Intrepid was owned by Dawn Ward,

a girlfriend of Derrick Crawford, who was a friend of the petitioner. (Tr.762-64,1251-54)

Kane testified that following the murder, a gold or tan Intreprid, registered to Dawn

18

Ward, was located in a salvage yard. (Tr.1251-54) Winfield testified that she knew the

petitioner to spend time with Crawford in Ward's Intrepid. (Tr.762-64) The testimony of

Kane and Winfield provided a potential link between the petitioner and the car used in

the shooting.

48.    In asserting that his trial counsel was ineffective, the petitioner claims that

the government's evidence, including Kane and Winfield's testimony, was false

because, the petititoner alleges, Dawn Ward did not own a Dodge Intrepid until June

2003, nearly three months after the murder. As the sole support for this claim, the

petitioner presents a copy of a retail sales contract dated 6/19/03, purporting to show

that Ward bought a 2000 "Brown" Dodge Intreprid from a Bradley, Illinois car dealer.

49.    Contrary to the petitioner's claims, the petitioner presents no evidence

(through affidavit or otherwise) from Dawn Ward or the car dealer to authenticate the

alleged transaction. Likewise, he presents no evidence from Ward to question whether

she also owned a gold or tan Dodge Intrepid in March 2003. At best, the petitioner's

claim raises the possibility that Ward owned two Intrepids, a gold or tan Inteprid that

was registered to her prior to the murder and located in a salvage yard, and a second

brown Intrepid that she purchased in June 2003. Moreover, the petitioner presents no

evidence to establish that his counsel was aware or should have been aware at the time

of the trial of any question as to Ward's ownership of a gold or tan Intrepid at the time

of the murder. Thus, it cannot be said that the petitioner's counsel acted unreasonably

in failing to challenge the testimony of two independent witnesses who provided a

potential link between the petitioner and the car used in the shooting. Finally, even assuming counsel acted unreasonably, the car evidence was relatively insignificant in comparison to the other overwhelming evidence of the petitioner's guilt, namely, the eyewitness testimony, fingerprint and DNA evidence, and the petitioner's admissions. Accordingly, there is no reasonable probability that counsel'a actions had any impact on the outcome of the trial.

Claim 1D

50.    The petitioner makes the bald assertion that his counsel was ineffective for failing to object to the government's use at trial of what the petitioner describes as blurry photographs. This is a conclusory claim, made without supporting authority, and therefore is without merit. It is difficult to conceive how photographs that did not identify the petitioner were unfairly prejudicial to him. In any event, any question as to the blurry nature of the photographs of the crime went to their probative value, not to their admissibility. Cf. United States v. Larkins, 83 F.3d 162, 167-68 (7th Cir. 1996) (inaudibility of tape recordings affected the weight of the evidence not the admissibility). Thus, this claim is without merit.

Claims 1E and 1F

51.    The petitioner further argues that counsel was ineffective in failing to call Tavorie Gray or John Lee to testify concerning whether Joe Taylor was an owner of the gun prior to its use in the murder. The petitioner claims that Gray and Lee could have impeached the testimony of Joe Tayloe, a government witness at trial, concerning the

"chain-of-custody" of the firearm. The petitioner further claims that counsel was ineffective for failing to impeach Joe Taylor with his pre-trial statement to agents that the petitioner admitted to Taylor that the petitioner stole the firearm from Larry Gray's apartment. The petitioner contends that this statement is inconsistent with Taylor's trial testimony that the petitioner denied to Taylor that he stole the gun.

52.    Contrary to the petitioner's claims, the petitioner's counsel thoroughly cross-examined Taylor at trial. Moreover, it is also difficult to conceive how the failure to impeach Taylor with his pre-trial statement that was more damaging to the petitioner could have had any prejudicial, rather than helpful, impact to the petititioner at trial. Likewise, any inconsistency as to Taylor's prior ownership of the firearm was largely irrelevant to the most damaging evidence that linked the petitioner to the gun. That evidence came from Larry Gray, who testified that he was in possession of the firearm prior to the murder, but that the firearm went missing after the petitioner visited Gray's residence.  (Tr.1048-60) Thus, given that testimony and the other overwhelming evidence discussed in detail above, there is no reasonable probability that any failure to impeach Taylor had any impact on the jury's guilty verdict.

Claim 1G

53.    In another conclusory argument, the petitioner contends that counsel was ineffective for failing to seek the assistance from a video enhancement expert. This conclusory and unsupported argument is likewise meritless. The premise of the petitioner's claim appears to be that enhancement of the video may have assisted the

petitioner in proving his lack of involvement in the murder. The problem with that premise is that it is based on nothing but sheer speculation. More importantly, the video evidence presented by the government did not implicate the petitioner, but rather only provided video evidence of the manner in which the crimes were committed. The other evidence, including the fingerprint and DNA evidence, the eyewitness testimony, and the petitioner's admissions, is what overwhelmingly established the petitioner's guilt. Thus, there is no basis to conclude that the petitioner's counsel acted unreasonably or that the failure to seek a video enhancement expert had any impact on the outcome of the trial.

<u>Claims 1H and 1I</u>

54.     The petitioner further argues that counsel was ineffective for failing to object to the jury instructions concerning Count 2, which charged the petitioner with using a firearm to commit the first-degree murder (as defined in 18 U.S.C. § 1111(a)) of Prendergast, in order to steal his Cadillac, as charged in Count 1, in violation of 18 U.S.C. § 924(c) and (j)(1). The petitioner further argues that this Court erred in instructing the jury as to Count 2. The petitioner contends that the jury instructions did not require the jury to find the petitioner guilty of first-degree murder.

55.     Once again, however, the petitioner's claims are conclusory and without any supporting authority. On that basis alone, they should be denied. Moreover, it is well established that under § 1111(a) and the felony-murder doctrine, a person who commits a dangerous felony "is guilty of murder if a death occurs during the

commission of the felony." United States v. Chanthadara, 230 F.3d 1237, 1252 (10th Cir. 2000). "Because malice aforethought is proved by commission of the felony, there is no actual intent requirement with respect to the homicide." Id. at 1258.

56.     Here, the jury was instructed that to find the petitioner guilty of Count 2, it was required to find that 1) the petitioner committed the crime of car-jacking with the intent to cause death or serious bodily harm, as charged in Count 1 of the indictment; and 2) the petitioner knowingly carried or used a firearm during and in relation to that crime. The jury further concluded in its special verdict that the petitioner caused the death of the victim named in the indictment and that the death of the victim occured as a consequence of the petitioner knowingly engaging in the carjacking or as charged in Count One of the indictment. Accordingly, the jury was properly instructed as to the elements of Count 2. See id.; United States v. Allen, 247 F.3d 741, 784 (8th Cir. 2001).

Claims IIA, B, and C

57.     The petitioner claims that his appellate counsel was ineffective for failing to argue that this Court erred in refusing to give a supplemental instruction to the jury following its questions during jury deliberations. Such an argument, however, would have been futile, since the parties agreed at trial that no such instruction should have been given. Given that agreement, any challenge to the failure to give a supplemental instruction would have been waived and therefore unreviewable on appeal. United States v. Griffin, 493 F.3d 854, 863-64 (7th Cir. 2007). Thus, there was no ineffective assistance of appellate counsel.

58.     The petitioner further argues that this Court erred in refusing to give a supplemental instruction. The petitioner, however, failed to raise this argument on appeal, so he is therefore barred from raising it in a § 2255 motion absent a showing of good cause for and actual prejudice from such failure. Mankarious v. United States, 282 F.3d 940, 943 (7th Cir. 2000). "Prejudice exists where an error has a substantial and injurious effect or influence in determining a jury's verdict." Id. at 944.

59.     Here, the petitioner has not established cause for his failure to raise this claim previously. Even assuming he has, there is no basis to conclude on collateral review that there is "grave doubt" about the harmlessness of any error in the failure to give a supplemental instruction. Id. at 943-44 (noting absence of "grave doubt" about the harmlessness of any error in failing to give jury instruction in light of substantial evidence of guilt). Indeed, as this Court concluded, the evidence against the petitioner was "overwhelming."

Claim III

60.     The petitioner argues that counsel was ineffective in failing to seek suppression of Shay Guttendorf's testimony because she was shown a photo array by government agents without the presence of the petitioner's counsel. This argument is plainly meritless, since it is well established that there is no constitutional right to the presence of counsel during the showing of a photo array to a witness. United States v. Ash, 413 U.S. 300, 321 (1973).

24

<u>Motion for Discovery</u>

61.     Finally, the petitioner has filed a motion for discovery, requesting access to video evidence presented at trial to allow for video enhancement and for additional DNA testing on the jacket seized near the Escalade. These requests are meritless. Rule 6 of the Federal Rules-Section 2255 proceedings provides that the Court may, for good cause, authorize discovery under the Federal Rules of Criminal or Civil Procedure. The petitioner's requests for discovery is based on mere speculation that additional testing on evidence may lead to evidence favorable to him. Such speculation does not constitute good cause. Hubanks v. Frank, 392 F.3d 926, 933 (7th Cir.2004) (discussing Rule 6(a) of the rules governing proceedings under 28 U.S.C. § 2254).

WHEREFORE, the United States of America respectfully requests that the petitioner's § 2255 motion and his motion for discovery be denied.

Respectfully submitted,

RODGER A. HEATON
UNITED STATES ATTORNEY

s/Timothy A. Bass
Timothy A. Bass
Bar No. MO 45344
Assistant United States Attorney
201 S. Vine St., Suite 226
Urbana, IL 61802
Phone:  217/373-5875
Fax: 217/373-5891
tim.bass@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I certify that I mailed a copy of the foregoing to:

      Antonio Sherrod
      Reg. No. 14231-026
      Victorville USP
      U.S. Penitentiary
      Inmate Mail/Parcels
      P.O. BOX 5500
      Adelanto, CA 92301


                              s/Timothy A. Bass
                              TIMOTHY A. BASS, Bar No. MO 45344
                              Assistant United States Attorney
                              201 S. Vine St., Suite 226
                              Urbana, IL 61802
                              Phone:  217/373-5875
                              Fax: 217/373-5891
                              tim.bass@usdoj.gov