E-FILED
Friday, 19 December, 2008  08:39:28 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| ANTONIO SHERROD, | ) | |
| | ) | |
| **Petitioner,** | ) | |
| v. | ) | **Case No. 08-CV-2013** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Respondent.** | ) | |

## OPINION

Petitioner, Antonio Sherrod, was convicted, following a jury trial, of carjacking with the intent to cause death and serious bodily harm (18 U.S.C. § 2119(3)), carrying and using a firearm to commit first degree murder (18 U.S.C. §§ 924(c)(1)(A)(iii), (D)(ii) and (i)(1)), and felon in possession of a firearm (18 U.S.C. § 922(g)(1)).  He was sentenced to two consecutive life terms in the Bureau of Prisons.  Following the Seventh Circuit's affirmance of his conviction on appeal, Petitioner filed this Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence (#1) on January 14, 2008.  Petitioner also filed a Rule 6 Motion Requesting Discovery under 28 U.S.C. § 2255 (#3). The government issued its Response (#11) on April 15, 2008 and Petitioner filed his Reply (#14) to the government's Response (#11) on August 25, 2008.  For the reasons that follow, this court DENIES both Petitioner's Motion (#1) to Vacate, Set Aside, or Correct Sentence and Petitioner's Rule 6 Motion Requesting Discovery (#3).

### BACKGROUND

Petitioner was convicted following a jury trial of carjacking with intent to cause death and

serious bodily harm, using a firearm to commit first degree murder, and possessing a firearm as a convicted felon.  He was sentenced to two consecutive life terms.  On appeal to the Seventh Circuit, he challenged (1) the jurisdictional basis of his carjacking conviction; (2) the admission at trial of statements he made following his arrest; and (3) the determination of his sentence.  United States v. Sherrod, 445 F.3d 980, 981 (7th Cir. 2006).  The Seventh Circuit rejected all of Petitioner's arguments and affirmed his conviction.  Following the affirmation of his convictions on appeal, Petitioner filed this 28 U.S.C. § 2255 motion.  Here is a very brief summation of the facts of the case from the Seventh Circuit opinion:

> "Around midnight on a March evening in 2003, 24-year-old Stephen Prendergast was driving his girlfriend, Reagan Booker from Matteson, just south of Chicago, to Champaign, where she attended college.  Two girls, Reagan's sister Loren and Tiffany Sanders, both also students at the college, were also traveling to Champaign with Prendergast and Reagan, but they were in a separate car. Prendergast was driving a flashy 2003 Cadillac Escalade.  They stopped at the Amoco station as Prendergast pulled the Escalade up to a pump.  He got out of the car and entered the convenience store.  When he returned and was about to enter his car, he was met by a man who turned out to be Antonio Sherrod.  Sherrod confronted Prendergast, demanded his car keys, and shot him at point blank range with a 9 mm handgun.  Ms. Booker ran from the Escalade as Sherrod commandeered it and drove off.  Prendergast died a short time later of a bullet wound to his heart."  Sherrod, 445 F.3d at 981.

On January 14, 2008, Petitioner filed his Motion to Vacate, Set Aside, or Correct Sentence

(#1).  The same day he also filed a Rule 6 Motion Requesting Discovery (#3).  The government filed

its Response (#11) on April 15, 2008 and Petitioner filed his Reply (#14) on August 25, 2008.  Both

of Petitioner's Motions, along with his Reply, and the government's Response are lengthy detailed

documents.

Defendant's trial began on October 13, 2004.  The first government witness called was Shay

Guttendorf.  Guttendorf was employed at a cashier at the Amoco gas station in Kankakee on the

night of the murder, March 16, 2003.  On the night in question, Guttendorf was on duty when the

victim pulled up in an Escalade.  There was a female passenger in the Escalade, on the passenger

side, and a second car that pulled up with the Escalade.  The second vehicle was red and the

Escalade's female passenger seemed to know them, as she was chatting with them.  The Escalade

was "cream or silver" and the driver came in to pay for the gas he had pumped.  The driver came

in and paid $20 for the gas, went out and pumped the gas, came back in to use the restroom and

purchase a cigar and then left.  As he returned to the Escalade, a gentlemen appeared and shot the

driver.  The shooter then took off in the Escalade as the driver ran about ten feet and fell to the

ground.  Guttendorf did not see the shooter until the victim returned to his Escalade.  Guttendorf

described the shooter as 5 foot 7 inches tall, dark skin, thin, wearing a dark black hooded sweatshirt

with dark blue jeans. Guttendorf called 911 following the shooting.  The female passenger in the

Escalade ran out of the vehicle around the back following the shooting.

The government then played for Guttendorf and the jury surveillance video from the gas

station of the shooting incident.  The video showed an Escalade arrive and circle around the gas

pumps.  Guttendorf identified Petitioner in open court as the shooter who killed the victim.

Guttendorf also picked the Petitioner's photograph out of a photo lineup as being the shooter in an

interview with Lieutenant Kane of the Kankakee police in December 2003. She also gave a statement that she did see the face of the man who did the shooting and saw his hands and did not believe he was wearing gloves because the skin tone on his hands matched that of his face.

Following Guttendorf's testimony a stipulation was entered into the record that Petitioner had been convicted of a crime punishable by more than one year in prison prior to March 16, 2003. The court then gave the jury a limiting instruction so the jury would only the consider that evidence as it relates to count 3 of the indictment, and not counts 1 or 2.

Next to the stand was Lakesia Winfield. Winfield had known Petitioner all her life. They began dating in March 2003 and had been good friends before that. Petitioner's best friend in March 2003 was Derrick Crawford. Crawford was not employed. Petitioner did not have a car. Crawford, however, did own a car. Crawford owned an older model white "Grand Marquis." Crawford's girlfriend was Dawn Ward, who also lived in Kankakee. Crawford also drove a brown/gold/tan Dodge Intrepid owned by Ward every day. The person Winfield saw most often riding with Crawford in the gold Intrepid was Petitioner. Petitioner would be in the front with Crawford. On cross, Winfield admitted she had seen Joe Taylor with Crawford in the Intrepid at times.

Next to the stand was Earl Cote, a veteran officer of the Kankakee police department. On the evening of March 16, 2003, Cote was off-duty at his home. He received a call to go to the Amoco gas station in question and found other officers present when he arrived. He and the other officers began to search the immediate area for evidence related to the shooting. A shell casing and blood were recovered at the gas station. After Cote secured the store surveillance video tape and evidence recovered at the scene, he then resumed his investigation in other areas in close proximity to the Amoco. The Escalade was recovered in close proximity to the crime scene. Also found in the area

of the Escalade was the gun and a coat. The police located the Escalade through the use of the "OnStar" tracking system in the car. When the Escalade was located the passenger window was down, and the interior was clean with no apparent damage. The keys were not in the vehicle and it was locked. The dash area of the vehicle had stereo equipment and what looked to be a flat screen television and none of those items appeared to be disturbed.

The gun and coat were discovered nearby. The handgun was a 9 millimeter semiautomatic pistol made by High Point. While at the location where the car, gun, and jacket were found, Cote was advised that a bullet had been recovered from the victim Steven Prendergast, so he traveled to the hospital and secured the evidence. Sometime after the initial investigation on March 16-17, 2003, Cote met with Illinois State Police crime scene investigator Sgt. Robert Deel. Deel processed the interior and exterior of the Escalade for evidence.

On cross examination, Cote noted that to get from the area where the Escalade was discovered to where the gun was discovered you would have to use an alley and climb a fence. Also, on the sidewalk near where the gun and coat were found, there were no muddy footprints. To Cote's knowledge, 6 to 8 officers were on the scene where the handgun and coat were found and two were at the Escalade's location. Also, when Cote arrived at the Escalade the passenger window was down, however on the Amoco station video, as it is being driven away, the window appears to be up.

Next to the stand for the government was Barry Thomas, a lieutenant with the Kankakee County sheriff's department. Thomas responded at about 1:15 am on March 17, 2003, to a call in the area of the 600 block of Wildwood Avenue in Kankakee near the Amoco gas station. He went down the east alley of the 600 block of Wildwood and located a vehicle that the police were looking

for behind an abandoned boarded-up house.  He found a white Cadillac Escalade parked in the back yard of the location.  He called it in to dispatch and a lot of other cars began arriving.

Next to the stand was Sgt. Robert Deel of the Illinois State Police, a crime scene investigator. Deel covered the entire Escalade looking for fingerprints.  He lifted prints from the interior door handle of the driver's door, steering wheel, inside of the driver's door, and left rear passenger door. The lifted prints were then turned over to Sgt. Cote.

The government called Lyle Boicken to the stand.  Boicken was a forensic scientist in the field of forensic biology and forensic DNA analysis with the Illinois State Police Crime Laboratory in Joliet.  Boicken conducted a DNA analysis on a black jacket in connection with the Steven Prendergast murder.  Boicken "taped" the jacket to collect any hairs or other materials that could be used to identify DNA.  He then sent it on to another section for those materials in the tape to be analyzed for DNA.

Walter Sherk was next to the stand.  Sherk was a forensic scientist in the field of firearms/tool marks identification for the Illinois State Police Forensic Science Command Lab in Joliet.  Sherk tested the bullet recovered from the body and the cartridge from the crime scene to see if they were fired from the gun recovered in the vicinity of the Escalade.  Sherk's testing concluded that the bullet and cartridge did indeed come from the gun recovered by police and could have come from no other gun in the world.

Later called to the stand was Terry Melton, president and CEO of Mitotyping Technologies, a company that does a kind of DNA testing known as mitochondrial DNA testing.  Melton conducted a mitochondrial DNA analysis on Petitioner's known hair sample and suspected hair sample recovered from the black jacket found near the gun, and found that Petitioner and his

maternal relatives could not be excluded as the donor of the found hair.  She was 95% sure that no more than  a quarter of a percent of North Americans would have that type of DNA.  Mitochondrial DNA is saved for such things as hair samples, on which nuclear DNA testing cannot be performed.

Next to the stand was Tiffany Sanders, a friend of Reagan and Loren Booker who attended school with them at Parkland College in Champaign.  Sanders traveled back to Parkland from her home in Chicago with the victim and the Bookers on March 16, 2003.  Sanders was in Reagan Booker's mother's red car with Loren and Reagan was riding with the victim in his car.  They stopped at the Amoco in Kankakee at around 11:00 pm.  When they stopped at the Amoco, Sanders was driving with Loren Booker in the passenger seat.  Upon arrival, the victim parked at one side of the pump and Sanders parked on the other side.  Reagan Booker came over to talk to Sanders and her sister while the victim went into the Amoco.  When he came out to pump gas, Reagan went back over to him.  The next thing Sanders recalled was the victim going to get into the driver's seat and Reagan going to the passenger seat.  Sanders then heard a gunshot and looked over to see the victim collapsing.  Sanders was only able to see part of the face of the shooter, who she described as African-American.  She recalled he was wearing a black hooded sweatshirt.  She saw the keys fall from the victim's hand as he was hitting the ground.  The shooter then got into the Escalade and drove off.  She was able to see the shooter's face at an angle.  In December 2003 an officer (Lieutenant Kane) showed her a number of photographs.  She could not make a positive identification of the shooter in the lineup of shots she was shown.

On cross examination defense counsel presented Sanders with a statement she had given police dated March 17, 2003, in which she says that after she saw the shooter snatch up the victim's keys from the ground, she heard another gunshot, and then saw the shooter jump in the Escalade.

-7-

Right at that same time, according to Sanders's statement, she noticed another black male over by the back of the Escalade wearing a black floppy hat crouching down behind the vehicle when the second shot went off.

Forensic pathologist Bryan Mitchell testified that the victim was killed by a single gunshot wound.

Larry Gray testified next for the government. Gray has a cousin named Joe Taylor who lives in Kankakee. Gray lived alone at a residence on North Roosevelt road in Kankakee. Taylor, who also lived in Kankakee, would stop by to visit Gray from time to time at his home. Through Taylor Gray came to know the Petitioner. Gray moved to the North Roosevelt address in November 2002. Gray also had known, most of his life, a cousin of Taylor's named John Lee. In January 2003, at his home, Taylor and Lee were visiting. Lee brought a firearm over to Gray's house. Gray described it as a "black gun" that was an automatic. Lee gave the gun to Taylor. Taylor then put the gun in a black "sofa chair" in Gray's house and left it there. Lee and Taylor left, but the gun remained. Maybe a month later Petitioner came over to Gray's house. Petitioner came over looking for someone, but the only people in the house were Gray and Petitioner. When Petitioner came in, Gray was in the shower and told Petitioner to wait as got out of the shower. Petitioner, who was in the living room with the chair containing the gun, told Gray, who was getting out of the shower, that he would be right back. Petitioner never came back. The next day Gray looked in the area of the sofa chair for the firearm but could not find it. No one besides Gray had been in his home and had access to the gun since Petitioner had been there. No one else had come into the home since Lee had brought the gun over and been in the home while Gray was there but out of their sight. When shown the gun used in the shooting of Prendergast, Gray identified it as the gun that Lee had brought

to his home and had gone missing following Petitioner's visit.

Next to the stand was Loren Booker, older sister of Reagan Booker.  The Booker sisters attended Parkland College together in Champaign in the spring of 2003.  Tiffany Sanders lived in Champaign with them.  They were all from the south suburbs of Chicago.  Reagan's boyfriend, victim Steven Prendergast, lived in Matteson, Illinois, about 30 to 45 minutes south of Kankakee.  On the day of the murder, Loren was riding with Tiffany Sanders from Chicago to Champaign and Reagan was riding with the victim in his Cadillac Escalade.  When they pulled into the Amoco station in Kankakee Tiffany was driving and Loren was a passenger.  Both cars parked parallel to each other on opposite sides of a gas pump.  Reagan came over to Loren's car and they both talked while the victim went into the convenience store.  The victim came out and then went into the store a second time to use the restroom.

Reagan and the victim were about to get back into the Escalade and drive away when the victim was shot.  The shooting happened as Tiffany and Loren were pulling away from the gas station to get back on the road.  As they were pulling away, Loren heard the shot, looked back, and saw another person standing where the victim was that was not Reagan.  She described the shooter as a "darker guy," about the same size and height as the victim but smaller.  He was wearing a hooded sweatshirt, skullcap, gloves, jeans, and black shoes.  Loren saw the shooter from his profile side.  As the victim fell to the ground, the shooter stood over him.  Loren saw the victim hand the shooter his keys and that the shooter's gun was an automatic.  She saw the shooter aim at the victim again, but did not hear a gun go off.  She saw the shooter emerge from the passenger side of the truck behind the victim's Escalade.  On cross examination defense counsel asked Loren about the gloves she said the shooter wore and his dark skin complexion.

Next to the stand was Reagan Booker.  She and the victim had been dating since 2001.  The victim drove a Cadillac Escalade that he had gotten just three months prior to the shooting.  The vehicle's interior had a television "flip-down" from the ceiling and a television/radio located in the front of the car between the driver and passenger so that it was visible to back seat passengers. Tiffany Sanders and her sister Loren were behind them in Reagan's mother's Pontiac Grand Am.

At the Amoco gas station in Kankakee, the victim got out to pay for gas.  She got out of the Escalade to talk to her sister and Sanders.  After the victim came out of the Amoco a second time, they both began to get back in the Escalade.  Reagan went around to the passenger side and began to get in the car when she saw someone approach the victim.  The victim was almost in the car, with one foot outside.  The person who approached the victim was dark, wearing a black hat and black Carhart coat.  She heard the victim and stranger yelling, and she noticed the stranger had a black gun that was not a revolver.  The victim exited the vehicle and Reagan heard a shot.  She ran around to the other side of the vehicle (around the back).  As she approached the driver's side of the Escalade she saw the shooter and the victim standing near the front.  The victim had his back to Reagan and the shooter was facing her.  Since he had a hat on, Reagan could not see the shooter's hair, only his face.  He had a dark skin tone.  She saw the shooter ask the victim for the keys.  He was not wearing gloves.  After the victim gave the shooter the keys the shooter leapt into the Escalade, made a left hand turn, and exited the Amoco.  She did get a good look at the shooter's face.  Reagan then made an in-court identification of the Petitioner as the man who shot Steven Prendergast on March 16, 2003.  In November 2003 Reagan identified Petitioner in a photo lineup.  She identified the jacket recovered near the abandoned Escalade as the one the shooter wore.

-10-

On cross examination Reagan admitted that she gave police a March 17, 2003, statement in which she said she was not certain she could identify the shooter, all she knew was he wore a black skull-cap and coat and had dark skin. She did not get a good look at his face. However, she did say that she "got a look" at the shooter's face.

Next to the stand was Karen Heard, an Illinois State Police forensic scientist who lifted latent fingerprints from the victim's Escalade. She found no fingerprints on the gun recovered near the Escalade. She found 10 latent fingerprint impressions from car that she found suitable for comparison. Petitioner's fingerprints were found on the interior door handle of the driver's side door. Petitioner's fingerprints and palm prints were found on the Escalade's steering wheel.

Next to the stand was Joe Taylor. Taylor is a cousin of Larry Gray. Taylor was close to Gray and would probably see him every other day. Taylor remembered that Derrick Crawford, whom he knew, had a girlfriend named Dawn. Taylor was also familiar with his cousin, John Lee. Taylor received a gun from Lee around January 2003. He received the gun from Lee when he was over at Larry Gray's house. Lee offered to sell the gun to Taylor, but Taylor could not afford it. It was a gray-black nine millimeter gun. Lee then told Taylor he could keep the gun and just pay him later. Taylor then told Gray to keep the gun for him and Gray put it in a back room. Since he told Gray to hide the gun, Taylor saw it a number of times thereafter at various points in the house, such as the bedroom or front living room and either he or Gray would be handling it.

Taylor had known Petitioner for more than five years. He knew Petitioner to have a girlfriend named "Kesia." Probably about a month after Lee gave him the gun, the gun came up missing. Taylor asked Gray about it and Gray searched the house, realizing it was gone. Gray told Taylor that Petitioner had been to his house and the he believed Petitioner was the one who took the

gun.  Gray told Taylor that Petitioner had entered his house while he was in the shower and had discussed taking a ride somewhere.  It was after that incident that Gray noticed the gun was missing. After Gray told Taylor that he believed Petitioner had taken the gun, Taylor spoke with Petitioner by phone.  Taylor asked Petitioner if he had the gun and Petitioner said no.  Taylor then told Petitioner that Gray believed he, Petitioner, was the last one at his home and the believed Petitioner had taken the gun.  Petitioner again denied taking the gun.  Petitioner then asked Taylor what kind of gun it was and that he would look around and probably get the gun back.  Taylor identified the gun recovered in the area of the Escalade as the gun that John Lee had given him and he had left with Larry Gray.

Taylor was cross examined about his cooperation with the government and how that would factor into his upcoming federal sentencing.  Taylor was also cross examined about a Dodge Intrepid, the same car owned by Derrick Crawford's girlfriend Dawn Ward, pulling away from the Amoco station after the victim's murder.  Taylor denied being in the Intrepid that night.

The government's next witness was Kevin Cronin, a special agent with the Bureau of Alcohol, Tobacco, and Firearms.  Cronin participated in a photographic lineup identification by Regan Booker on November 4, 2003.  The lineup was organized by Lieutenant Patrick Kane of the Kankakee police department.

Next to the stand was Lieutenant Patrick Kane of the Kankakee police department.  On March 17, 2003, Kane responded to a call at the Amoco gas station at about 12:30 in the morning. As part of his investigation, he determined that Dawn Ward owned a gold or tan colored Dodge Intrepid prior to March 16, 2003.  Kane believed this was the vehicle seen on the security camera footage from the night of the murder from which it was believed that the shooter emerged.  The nine

-12-

millimeter gun that was recovered did not have a ready bullet in the chamber.  To Kane, this indicated one of two things: either the weapon had been unloaded and then reloaded in the magazine but not one bullet was put in the chamber or that there was a malfunction of some type in which a round did not wind up back in the chamber.  In late 2003 he submitted Petitioner's fingerprint card to Karen Heard, the fingerprint expert.

On November 4, 2003, Kane presented a photographic lineup to Regan Booker.  At no time did he suggest to her that Petitioner was a suspect.  He repeated the same procedure for Loren Booker and Shay Guttendorf.  Petitioner was arrested on December 8, 2003.  He was taken to an interview room to be interviewed by Kane with Special Agent Dennis Fritzsche of the ATF also present.  Petitioner denied knowing the victim in the case and had never been in the Escalade with the victim or anyone else.  Petitioner denied being at the Amoco gas station the night of the murder. Petitioner also told Kane, referring to the Amoco security camera video, "I'll bet you the video don't show my real face, do it?"  Petitioner told Kane his fingerprints would not be on the handgun nor would they be inside the Escalade.  He also said his DNA would not be on the recovered jacket. When told that investigators had found the jacket, Petitioner responded "You found that jacket, huh?"  Petitioner said he had never met the victim but did make a reference to the presence of someone else besides the victim inside the Escalade, stating "That woman can't identify me."  Kane testified that at no time prior to Petitioner's statement did he or Agent Fritzsche say anything to Petitioner about anyone other than Prendergast being in the front seat of the Escalade.

Petitioner also asked Kane how he was going to charge him with carjacking if the keys were not in the vehicle.  Indeed, when the Escalade was recovered the keys were missing.  Kane testified that at no time prior to Petitioner's statement did he inform him that the keys were missing from the

vehicle.  In referring to the employees who work at the Amoco, Petitioner stated "Can't trust those whores at the gas station."

On cross examination, Kane admitted that he never used the Dodge Intrepid seen at the Amoco at the time of the murder as a lead for his investigation until Petitioner was charged.  He never attempted to identify the individuals that were inside the Intrepid before Petitioner was charged.  Kane admitted that he never tried to identify the person who got out of the Intrepid and walked up to the front of the gas station until Petitioner was charged and to this day does not know who that person was.  Kane testified that Petitioner became a focus once they worked backwards on who possessed the gun found and in conjunction with Petitioner's fingerprints being found inside the Escalade.

Next to the stand was Dennis Fritzsche, an agent with the ATF.  Fritzsche identified the firearm used in the murder as a High Point Model C9 semiautomatic pistol.  Fritzsche was also present with Kane as Petitioner was interviewed on December 8, 2003.  During the interview Petitioner indicated that the videotape at the Amoco station would not show his real face and that his fingerprints would not be found on the gun or the recovered stolen vehicle.  He also stated his DNA would not be found on the recovered jacket nor would the woman in the front seat of the Escalade be able to identify him.  No one in Fritzsche's presence had ever told Petitioner, prior to his statement, about any other person being the Escalade besides the victim.  Fritzsche also backed up Kane's testimony regarding Petitioner's statements about the fingerprints and Amoco employees.  Fritzsche saw Petitioner the next day, December 9, 2003, in the marshal's lock-up in Urbana.  He went to the lock-up to help calm Petitioner down.  He observed Petitioner to be jumping around the cell, pounding his fists into the cell door and into the cement blocks on the side of the cell.

Petitioner informed Fritzsche that he did not murder anyone and that he was only in trouble because he tried to steal a radio out of the car. Petitioner said he had observed the actual murderers get in a truck and another vehicle. That was the first time Fritzsche had ever heard Petitioner say anything about trying to steal a radio.

Following the close of the government's case defense counsel moved for a directed verdict, which was denied. The defense called two witnesses. The first was Randy Hartman, an investigator for the Kankakee police department. Hartman was questioned regarding an August 2003 incident involving Petitioner not directly related to the instant case. Richard Noble, a private investigator with the law firm of Beckett & Weber in Urbana (defense counsel's firm) testified next.

Following the close of evidence, the court held the jury instruction conference. After closing arguments were given the jury retired to deliberate on a verdict. During deliberations, jurors submitted a jury question to the court. The question read:

"We have two questions for you.

1: Please define 'intent' as it is used in the fourth proposition on page 23. A: Once a loaded gun is involved in a crime, is 'intent' assumed?

2: Please clarify: If the verdict in Count 1 is not guilty, then the verdict for Count 2 must be not guilty?"

With regard to question 1, both parties agreed with the court that jurors should refer to instructions they have already been given. With regard to question 2, again, both parties agreed with the court that jurors should refer to the instructions they had already been given. Following deliberation, the jury found Petitioner guilty on all counts. On February 11, 2005, Petitioner was sentenced to two consecutive life terms in the Bureau of Prisons. Petitioner's conviction was

-15-

affirmed on direct appeal by the Seventh Circuit.  United States v. Sherrod, 445 F.3d 980 (7th Cir. 2006).

PETITIONER'S MOTION AND THE GOVERNMENT RESPONSE

Petitioner's Motion to Vacate, Set Aside, or Correct Sentence (#1), filed on January 14, 2008,  contains a number of grounds that he believes require this court to overturn his conviction and order a new trial.  Petitioner's grounds will be presented, with each ground being followed by the government's response and this court's ruling.  In its Response, the government broke down Petitioner's various grounds into subsections.  For clarity, the court will adopt the method used by the government to separate and address Petitioner's claims.

Claims 1A, 1B, 1C

Petitioner claims that trial counsel was ineffective for allowing false arguments from the government in regards to the Dodge Intrepid used in the murder.  Petitioner claims that the Intrepid used did not belong to Dawn Ward, as argued by the government, and that a contract for Dawn Ward's Intrepid reveals that she did not purchase her vehicle until June 2003, three months after the murder.  Petitioner further argues that Lt. Kane's testimony at trial identifying the Intrepid on the security tapes as belonging to Dawn Ward based on comparing it to a picture of Ward's vehicle was false.  Petitioner argues counsel should have objected to Lakesia Winfield's testimony regarding Dawn Ward as being the owner of the Intrepid.  Petitioner also claims that the Intrepid seen in the video was owned by a Kristina Kirchner, and defense counsel told Petitioner he would utilize Kirchner at trial to prove Dawn Ward did not own the Intrepid.  Counsel never called Kirchner at trial.

The government responds to Petitioner's argument regarding the Intrepid by pointing out that

at trial, the government's evidence, including the video evidence, established that the person who shot the victim had emerged from a tan or gold Dodge Intrepid that had arrived at the gas station, slowly circled around the victim's vehicle, and parked at an adjacent pump. The government contends that the testimony of Lt. Kane and Winfield established that the Intrepid in question was owned by Dawn Ward, girlfriend of Derrick Crawford, who was a friend of Petitioner. Kane testified that following the murder, a gold Intrepid registered to Ward was found in a salvage yard. Further, Winfield testified that she knew Petitioner to spend time with Crawford in Ward's Intrepid, providing a link between Petitioner and the car used in the shooting. Further, the government contends that the only support Petitioner has for his claim that Ward did not own the Intrepid until June 2003 is a copy of a sales contract dated 6/19/03, purporting to show that Ward bought a brown Intrepid in Bradley, Illinois. The government argues that Petitioner has presented no evidence from Dawn Ward or the car dealer to authenticate the alleged transaction or evidence from Ward questioning whether she owned a gold or tan Intrepid in March 2003. Also, the government argues Ward may have owned two Intrepids. Further, the government argues that there is no evidence that counsel was aware of Petitioner's claims at trial and thus could not have been ineffective for failing to challenge the testimony of two independent witnesses who provided a link between Petitioner and the car used in the shooting. Finally, the government claims, even if it were found that counsel acted unreasonably, the evidence against Petitioner from eyewitness testimony, fingerprints, and DNA was overwhelming so as to overcome any impact counsel's actions may have had on his case.

The Court's Ruling on Claims 1A, 1B, and 1C

Petitioner has alleged that his counsel was ineffective for failing to challenge certain witnesses and government evidence relating to the identification of the Dodge Intrepid from which

the shooter exited before the victim's murder.  A convicted defendant's claim that counsel's assistance was so defective as to require reversal and a new trial must satisfy two prongs: (1) defendant must show that counsel's performance was deficient and (2) defendant must show that that deficient performance prejudiced him.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  Regardless of when that claim is made, and because counsel is presumed effective, a defendant bears a heavy burden in making out a winning claim based on ineffective assistance of counsel.  United States v. Trevino, 60 F.3d 333, 338 (7th Cir. 1995).  The convicted defendant must show that his counsel's representation fell below an objective standard of reasonableness.  Strickland, 466 U.S. at 688.  The purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, but rather to see that a defendant has received a fair trial.  Strickland, 466 U.S. at 689.  Concerning the performance prong, a defendant must direct the court to the specific acts or omissions which inform his claim and the court must then determine whether, in light of all the circumstances, the alleged acts or omissions were outside the wide range of professionally competent assistance.  Strickland, 466 U.S. at 690.  There is a strong presumption that counsel's performance was reasonable.  Strickland, 466 U.S. at 698.

Under the performance prong of the Strickland test, counsel's performance in the context of the case as a whole is considered and it is viewed at the time of the conduct with a strong presumption that the defendant received effective assistance.  Hardamon v. United States, 319 F.3d 943, 948 (7th Cir. 2003).  For the second prong of the Strickland test, prejudice, the defendant must show that a reasonable probability exists that, but for his counsel's poor performance, the result of the trial would have been different.  Hardamon, 319 F.3d at 948.

Petitioner's argument must fail.  This court first notes that it agrees with the government that

the Petitioner has not presented adequate evidence to support his claim. However, even without discussing whether or not his counsel's performance was unreasonable, the evidence against Petitioner at trial outside of the Dodge Intrepid was so overwhelming that even if counsel's performance was deficient the result of the trial would not have been different. Reagan Booker, the victim's girlfriend and eye-witness to the murder, identified Petitioner in a photo-lineup and in court at trial as the shooter. Petitioner's DNA was found on the jacket recovered in the area of the victim's Escalade. Finally, Petitioner's fingerprints were found inside the Escalade. Petitioner could not satisfy the prejudice prong of the Strickland test and thus his claim for ineffective assistance of counsel as it relates to his counsel's failure to challenge the government on the evidence relating to Dawn Ward's ownership of the Dodge Intrepid must fail.

Claim 1D

In his next claim, Petitioner claims his counsel was ineffective for failing to object to "improper use of photographs of the shooter exiting the gold Intrepid." Petitioner claims the photographs violated Federal Rule of Evidence 403 because the government used them for identification purposes and the face of the shooter on the photos was blurry and the photos' probative value was outweighed by the prejudice to Petitioner.

In response, the government argues that Petitioner's claim is conclusory and that it is difficult to conceive how photographs that did not identify Petitioner were unfairly prejudicial to him. Further, the government contends that any question as to the blurry nature of the photographs went to their probative value, not their admissibility, citing United States v. Larkin, 83 F.3d 162, 167-68 (7th Cir. 1996).

The Court's Ruling on Claim 1D

-19-

The court agrees with the government that Petitioner's claim is conclusory and that Petitioner did not suffer unfair prejudice from the admission of the photographs.  Rule 403 of the Federal Rules of Evidence states:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  Fed. R. Evid. 403.

Petitioner was not identifiable from the photographs.  He suffered no undue prejudice because of their admission, and they were of probative value since they showed the shooter who carried out of the murder of Steven Prendergast.  It was not ineffective assistance of counsel for defense counsel to fail to object to the use of the photographs.  Further, again, even if counsel's performance were unreasonable, Petitioner was not prejudiced because the other evidence in the case against Petitioner was so overwhelming that the result of the trial would not have been different.

Claims 1E and 1F

Petitioner further argues that counsel was ineffective in failing to call Tavorie Gray or John Lee to testify concerning whether Joe Taylor was an owner of the gun prior to its use in the murder.  Petitioner alleges that he has received reports that show that John Lee did not sell Joe Taylor the murder weapon, rather Taylor received the weapon from a Tavorie Gray.  Petitioner also claims that counsel was ineffective for failing to impeach Taylor with his pretrial statement to agents that Petitioner admitted to Taylor that he (Petitioner) stole the firearm from Larry Gray's apartment.  This statement is inconsistent with Taylor's statement at trial that Petitioner denied to him that he stole the weapon from Gray's residence.

-20-

The government responds that defense counsel thoroughly cross examined Taylor at trial. The government also points out that it cannot see how failure to impeach Taylor with his pretrial statement hurt Petitioner, as that statement would have been far more damaging to Petitioner, in that he admits to stealing the gun.  Finally, the government contends that any question about the chain of custody before the gun arrived at Gray's residence is irrelevant in the light of Gray's more important testimony that linked Petitioner to the disappearance of the gun from Gray's home.

The Court's Ruling on Claims 1E and 1F

The court agrees with the government's position that it was not ineffective assistance of counsel for defense counsel to fail to impeach Taylor with his pretrial statement.  Such a statement could be seen as harmful to Petitioner, even if bringing it in would have had the effect of impeaching Taylor.  It would have put before the jury a possible statement made by Petitioner admitting to stealing the gun used to commit the murder.  It was a strategic decision made by counsel.  Further, counsel's failure to elicit information concerning the dispute over the chain of custody of the gun prior to its arrival at Larry Gray's residence does not rise to ineffective assistance.  Even with the chain of custody dispute, there is still the testimony from Larry Gray connecting Petitioner's presence in his home with the disappearance of the gun used in the murder.  There is no reason to believe that had counsel elicited information from Tavorie Gray or John Lee as to how Taylor received custody of the gun, the outcome of Petitioner's trial would have been any different.

<u>Claim 1G</u>

Petitioner next claims that counsel was inefficient for failing to consult a video enhancement expert to enhance the Amoco security video to show that the face of the shooter who exited from the gold Intrepid was not Petitioner.

The government responds that Petitioner is making a conclusory argument that is unsupported by any evidence and rests on sheer speculation.

The Court's Ruling on Claim 1G

Petitioner's Claim 1G must also fail. There is no evidence that an enhancement of the video would have resulted in Petitioner's exoneration, and counsel's failure to consult an expert does not rise to the level of ineffective assistance. Further, the government's use of the video at trial was simply to show how the crime was committed. The identification of Petitioner as the shooter came from eye witness testimony and other evidence, such as DNA matches from the jacket worn by the shooter and fingerprints found inside the carjacked Escalade.

Claims 1H and 1I

Petitioner next makes two claims regarding his counsel's ineffectiveness for failing to object to jury instructions concerning Count 2 of the indictment, which charged Petitioner with using a firearm to commit first degree murder in order to steal the Escalade, as alleged in Count 1. Petitioner argues that the court erred in instructing the jury as to Count 2 because the jury instructions did not require the jury to find Petitioner guilty of first degree murder. Petitioner wanted the jury instructed in the requirements of 18 U.S.C. § 924(c) and (j)(1).

The government responds that Petitioner's claims are conclusory and without any supporting authority. Further, the government contends that under 18 U.S.C. § 1111(a) and the felony-murder doctrine, a person who commits a dangerous felony is guilty of murder if death occurs during that felony. United States v. Chanthadara, 230 F.3d 1237, 1252 (10th Cir. 2000). The government notes that in order for the jury to find Petitioner guilty of Count 2, it was required to find that: (1) the Petitioner committed the crime of car-jacking with the intent to cause death or serious bodily harm,

-22-

as charged in Count 1 of the indictment; (2) and the Petitioner knowingly carried or used a firearm during and in relation to that crime.  In its special verdict the jury further concluded that Petitioner caused the death of the victim named in the indictment and that the death of the victim occurred as a consequence of the Petitioner knowingly engaging in the car-jacking or as charged in Count 1 of the indictment.

The Court's Ruling on Claims 1H and 1I

The jury received the following instructions from the court before retiring to deliberate:

"To sustain the charge of car-jacking as charged in Count 1 of the indictment, the government must prove the following propositions: First, that the defendant intentionally took a Cardillac Escalade from a person or the presence of another person; second, the defendant did so by means of force and violence or by intimidation; third, the Cadillac Escalade had been transported, shipped, or received in interstate commerce; and, fourth, the defendant intended to cause death or serious bodily injury.

If you find from your consideration of all the evidence that each of these propositions has been proved beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any one of these propositions has not been proven beyond a reasonable doubt, then you should find the defendant not guilty.

'Serious bodily injury' means injury that involves a substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or

-23-

impairment of the function of a bodily member, organ, or mental faculty.

To sustain the charge of carrying or using a firearm during and in relation to a crime of violence as charged in Count 2 of the indictment, the government must prove the following propositions: First, that the defendant committed the crime of car-jacking with the intent to cause death or serious bodily harm as charged in Count 1 of the indictment; and, second, that the defendant knowingly carried or used a firearm during and in relation to that crime."

18 U.S.C. § 1111(a) states:

"Murder is the unlawful killing of a human being with malice aforethought. Every murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or committed in the perpetration of, or attempt to perpetrate, any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery; or perpetrated as part of a pattern or practice of assault or torture against a child or children; or perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, is murder in the first degree." 18 U.S.C. § 1111(a).

Under 18 U.S.C. § 1111(a), which largely follows the common law's definition of murder, there are several ways in which the element of malice aforethought can be satisfied and one of those ways is by the government showing that the killing was committed in the commission of a robbery, as under the traditional common law felony murder rule, the malice of the robbery satisfied the murder's malice requirement.  United States v. Thomas, 34 F.3d 44, 48 (2nd Cir. 1994).

In this case, the jury was provided with verdict forms for each count charged in the indictment.  The jury returned guilty verdicts on all counts.  For Count 1, the jury found that Petitioner guilty of the offense of carjacking with the intent to cause death or serious bodily harm, that Petitioner caused the death of the victim, and that the death of the victim occurred as a consequence of Petitioner knowingly engaging in the car-jacking as charged in Count 1.  This satisfied the requirements of the felony-murder rule and Petitioner's intent to commit the crime so as to find Petitioner guilty of first degree murder.  See 18 U.S.C. § 1111(a); Thomas, 34 F.3d at 48.  Petitioner's argument must fail.  The government had already proven Petitioner guilty of first degree murder once the jury returned a guilty verdict on Count 1.

The jury was also properly instructed as to the elements of Count 2.  The elements for Count 2 as alleged in the indictment were that Petitioner knowingly carried and used a firearm during and in relation to a crime of violence, in that he carried and used the firearm to commit the first-degree murder of Steven Prendergast as set forth in Count 1 of the indictment.  The jury, as has been already explained, found the two elements of the charge as laid out by the court in the jury instructions.  The jury had also found, in Count 1, that the Petitioner intended to cause death or serious bodily injury.  Under felony murder, the jury had already found that Petitioner committed first degree murder when he murdered the victim during the car-jacking.  Therefore, it was not ineffective assistance of counsel for defense counsel to fail to object to the jury instructions concerning Count 2 of the indictment.          Claims IIA, IIB, and IIC

Petitioner next claims his appellate counsel was ineffective for failing to file a rehearing enbanc on the car-jacking instruction after the appellate court denied his appeal.  Specifically, Petitioner wanted the district court to issue a definition of "intent" to the jury when they asked for

it, instead of just instructing them to use the instructions they had already been provided.

The government responds to Petitioner's argument by noting that any claim by appellate counsel concerning a supplemental instruction in answer to a jury question would have been futile, as the parties at trial agreed that no such instruction should have been given, and thus any challenge to the failure to give a supplemental instruction would have been waived and unreviewable on appeal.  As to the court's failure to give a supplemental instruction, the government contends Petitioner is barred from raising this argument in a § 2255 motion absent a showing of good cause for and actual prejudice from such a move on the court's part because Petitioner failed to raise this claim on direct appeal.

The Court's Ruling on Claims IIA, IIB, and IIC

When both parties agree that no instruction should be given, or when they both agree to an instruction and do not object, the issue is waived for appeal and is not reviewable on appeal.  United States v. Griffin, 493 F.3d 854, 863-64 (7th Cir. 2007).  In this case, when presented with the jury questions, both parties agreed that no further instructions should be given.  The issue was thus waived for appeal and was not reviewable.  Therefore, Petitioner's appellate counsel was not ineffective for failing to raise this issue on appeal.

As to Petitioner's claim in that the trial court itself erred in failing to issue a supplemental instruction based on the jury's question regarding "intent," he must fail on that issue as well. Petitioner failed to raise this argument on appeal and is raising it for the first time in his post-trial § 2255 motion.  "An issue not raised on direct appeal is barred from collateral review absent a showing of both good cause for and actual prejudice resulting from the failure to raise it." Mankarious v. United States, 282 F.3d 940, 943 (7th Cir. 2000).  In this case, Petitioner has not

-26-

established good cause for his failure to raise this claim on direct appeal.  Even if Petitioner were found to have good cause, prejudice cannot be said to exist as this court has already noted that the evidence against Petitioner, from the fingerprints in the vehicle to the eyewitness identification, was overwhelming.  There is no basis to believe that the failure to provide the jury with a supplemental instruction had a substantial and injurious effect or influence in determining the jury's verdict. Mankarious, 282 F.3d at 943.

Claim III

Defendant's final § 2255 claim is that his counsel was ineffective in failing to seek suppression of Shay Guttendorf's testimony because she was shown a photo array by the government without the presence of Petitioner's counsel.  Petitioner argues that this violated his right under the Sixth Amendment to confront witnesses against him.  Petitioner has also made a claim that counsel was ineffective for not cross examining Guttendorf with the 911 tape.

The government responds that United States Supreme Court precedent allows for the government to conduct photographic identification of a defendant with a witness without defendant's counsel being present.

The Court's Ruling on Claim III

First, as to Petitioner's claim about counsel's failure to cross examine Guttendorf with the 911 tape, he has provided no evidence that this prejudiced him in any way and affected the outcome of the trial.  Petitioner's claim fails.

Next, Petitioner's claim that it was a violation of his Sixth Amendment rights for Guttendorf's testimony to be admitted concerning her participation in a photo identification lineup without defense counsel present must also fail.  Here, Petitioner was not present at the photo lineup.

It was simply Guttendorf, government agents, and photographs.  In addressing this particular circumstance, the Supreme Court has written: "Since the accused himself is not present at the time of the photographic display, and asserts no right to be present" then "no possibility arises that the accused might be misled by his lack of familiarity with the law or overpowered by his professional adversary." United States v. Ash, 413 U.S. 300, 317 (1973).  The Court concluded:

> "We hold, then, that the Sixth Amendment does not grant the right to counsel
>
> at photographic displays conducted by the Government for the purpose of allowing
>
> a witness to attempt an identification of the offender." Ash, 413 U.S. at 321.

Based on this Supreme Court precedent, the Sixth Amendment was not violated by Guttendorf's viewing the photographic lineup without defense counsel present, and thus defense counsel's failure to object to her testimony at trial concerning the lineup was not ineffective assistance of counsel.

Defendant's 18 U.S.C. § 2255 Rule 6 Motion

On January 14, 2008, at the same time he filed his § 2255 Motion (#1), Petitioner filed a Rule 6 Motion (#3).  In his Motion (#3), Petitioner seeks all video surveillance tapes for enhancement purposes, claiming he can buttress his claim of ineffective assistance of counsel and disprove the government's theory as to who committed the crime by showing it was Derrick Crawford and not Petitioner who emerged from the Dodge Intrepid at the Amoco.  Petitioner also seeks the coat recovered in the area of the Escalade for DNA testing that he says is superior to the mitochondrial DNA testing carried out by Dr. Melton for the government at trial.

The government responds that Petitioner's requests are meritless as they are based on mere speculation that additional testing may lead to evidence favoring him.  The government contends

-28-

that this speculation is not good cause.

The Court's Ruling

Rule 6 of the Federal Rules of Evidence governing Habeas Corpus § 2255 cases states:

"Leave of Court Required.  A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law.  If necessary for effective discovery, the judge must appoint an attorney for a moving party who qualifies to have counsel appointed under 18 U.S.C. § 3006A.

Requesting Discovery.  A party requesting discovery must provide reasons for the request.  The request must also include any proposed interrogatories and requests for admission, and must specify any requested documents."  Fed. R. Evid. Section 2255 Proceedings 6(a), (b).

The Seventh Circuit, in reference to a similar motion for discovery made under § 2254 stated:

"In order to satisfy the two requirements of the Rule 6(a) test, [defendant] must: (1) make a colorable claim showing that the underlying facts, if proven, constitute a constitutional violation; and (2) show 'good cause' for the discovery." Hubanks v. Frank, 392 F.3d 926, 933 (7th Cir. 2004).

Petitioner here is relying on mere speculation as to what both a new DNA test and video enhancement will show. He has not shown good cause nor has he shown that the underlying facts, if proven, constitute a constitutional violation. This court agrees with the government that Petitioner's motion is based on speculation and he is hoping that additional enhancement and testing

-29-

will lead to evidence in his favor.  Petitioner's Rule 6 motion is denied.

For the foregoing reasons, Petitioner's Motion to Vacate, Set Aside, or Reduce Sentence (#1) is DENIED and Petitioner's Rule 6 Motion for Discovery (#3) is DENIED.

IT IS THEREFORE ORDERED THAT:

(1) Petitioner's Motions to Vacate, Set Aside, or Reduce Sentence (#1) and for Rule 6 Discovery (#3) are DENIED.

(2) This case is TERMINATED.

ENTERED this  19th  day of December, 2008

**s/ Michael P. McCuskey**
MICHAEL P. McCUSKEY
CHIEF U.S. DISTRICT JUDGE